1  JAMES POLISH (SBN 058034)
   jpolish@carlsmith.com
2  MARY R. CONKLIN (SBN 266173)
   mconklin@carlsmith.com
3  CARLSMITH BALL LLP
   515 South Flower Street, Suite 2900
4  Los Angeles, CA  90071-2225
   Telephone: 213.955.1200
5  Facsimile:  213.623.0032

6  PATRICIA A. CIRUCCI (SBN 210574)
   Patricia.Cirucci@sce.com
7  MARK A. ROTHENBERG (SBN 242213)
   Mark.A.Rothenberg@sce.com
8  SOUTHERN CALIFORNIA EDISON
   COMPANY
9  2244 Walnut Grove Avenue, Third Floor
   Rosemead, CA  91770
10 Telephone: 626.302.6704
   Facsimile:  626.302.6873

11
   Attorneys for Plaintiff
12 Southern California Edison Company

13

14                UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16

17 SOUTHERN CALIFORNIA              CASE NO.  8:17-CV-00618 JVS (DFMx)
   EDISON COMPANY, a California
18 Corporation,                     **PLAINTIFF'S MEMORANDUM OF
                                     POINTS AND AUTHORITIES IN
19                  Plaintiff,       OPPOSITION TO MOTION TO
                                     DISMISS OR STAY ACTION**
20 v.
                                     *[Request for Judicial Notice in support of
21 CITY OF LAGUNA BEACH, a           Opposition to Motion to Dismiss or Stay
   Municipal Corporation,            action, [Proposed] Order Granting
22                                   Request for Judicial Notice, filed
                   Defendant.        concurrently]*
23
                                     Date:     July 24, 2017
24                                   Time:     1:30 p.m.
                                     Judge:    Hon. James V. Selna
25                                   Ctrm:     10-C

26                                   Action filed:  April 5, 2017

27

28

4839-3625-9146.3

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ....................................................... 1

II.    THE APPLICABLE LEGAL STANDARDS ................................. 2

III.   THE RELEVANT ALLEGATIONS OF THE COMPLAINT ....................... 3

    A.    The Parties and the Franchise ................................................ 3

    B.    The Role of the CPUC ............................................................. 4

    C.    SCE's Repair and Replacement Programs ............................. 5

    D.    The Undergrounding Ordinance and its Effect ....................... 6

    E.    SCE's Complaint ....................................................................... 7

IV.   ARGUMENT ............................................................................ 8

    A.    SCE Has Stated Claims for Contract Clause Violations ..................... 8

        1.   The Franchise is a Contract for Purposes of the Application of the Contract Clause ................................. 9

        2.   The Franchise Grants SCE the Rights to Install, Maintain, Replace, and Repair Aboveground Electric Facilities ............. 11

        3.   The Undergrounding Ordinance Substantially Impairs SCE's Rights Under the Franchise ........................................ 13

        4.   The Undergrounding Ordinance is Not a Valid Exercise of the City's Police Powers ....................................... 15

        5.   The Undergrounding Ordinance is Not Reasonable or Necessary to Fulfill an Important Public Purpose .................. 20

    B.    The Court Should Not Decline to Exercise Supplemental Jurisdiction ........................................................................ 21

    C.    The City Has Not Satisfied the Requirements for *Pullman* Abstention .......................................................................... 23

V.    CONCLUSION ....................................................................... 25

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4839-3625-9146.3

i

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bavand v. One West Bank FSB*
2012 WL 1884668 (W.D. Wash. May 22, 2012) ................................. 22

*Beck v. Deloitte & Touche*
144 F.3d 732 (11th Cir. 1998) ................................................. 3

*Borough of West Mifflin v. Lancaster*
45 F.3d 780 (3rd Cir. 1995) ................................................. 23

*Brenek v. Town of Griswold*
2010 WL 2293173 (D. Conn. June 3, 2010) ................................. 22

*Cahill v. Liberty Mut. Ins. Co.*
80 F.3d 336 (9th Cir. 1996) ................................................. 3

*California Water and Tel. Co. v. County of Los Angeles*
253 Cal.App.2d 16 (1967) ................................................. 17

*Catena v. Capitol Records, LLC*
2012 WL 12942740 (C.D. Cal. July 11, 2012) ............................. 13

*Cf. Insco Ins. Services, Inc. v. Federal Ins. Co.*
2016 WL 7486283 (C.D. Cal. Apr. 1, 2016) ............................. 13

*City of Anaheim v. Pacific Bell Tel. Co.*
119 Cal.App.4th 838 (2004) ............................................. 18, 19

*City of Los Angeles v. Los Angeles Gas & Elec. Corp.*
251 U.S. 32, 40 S.Ct. 76, 64 L.Ed. 121 (1919) ......................... 9

*City of Santa Cruz v. Pacific Gas & Electric Co.*
82 Cal.App.4th 1167 (2000) ............................................. 11

*Consul Ltd. v. Solide Enterprises, Inc.*
802 F.2d 1143 (9th Cir. 1986) ......................................... 13

*County of Los Angeles v. Southern Cal. Tel. Co.*
32 Cal.2d 378 (1948) ................................................... 10

*County of Sacramento v. Pacific Gas & Electric Co.*
193 Cal.App.3d 300 (1987) ............................................. 11

*Detroit Memorial Park Ass'n, Inc. v. City of Detroit Bd. of Zoning Appeals*
105 F.Supp.3d 769 (E.D. Mich. 2015) ................................. 25

*Energy Reserves Group, Inc. v. Kan. Power & Light Co.*
459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) ................. 8

*Gilligan v. Jamco Development Corp.*
108 F.3d 246 (9th Cir. 1997) ........................................... 2

*Grand Trunk Western R. Co. v. City of South Bend*
227 U.S. 544, 33 S.Ct. 303, 57 L.Ed. 633 (1913) ................... 10, 13

*Hancock v. City of Ridgefield, Wash.*
2009 WL 4110804 (W.D. Wash. Nov. 23, 2009) ....................... 25

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

1

<u>**TABLE OF AUTHORITIES**</u>
**(continued)**

2

<u>**Page**</u>

3
*Housing Rights Center, Inc. v. Moskowitz*
   2004 WL 3738293 (C.D. Cal. Sept. 20, 2004)............................................22, 23

4
*In re South Bay Expressway, L.P.*
   434 B.R. 589 (S.D. Cal. July 28, 2010)................................................................9

5

*Kelly v. Lopeman*
6    680 F.Supp. 1101 (S.D. Ohio 1987)...................................................................25

7
*Lozano v. Pacific Gas & Elec. Co.*
   70 Cal.App.2d 415 (1945)...................................................................................21

8
*Porter v. Jones*
   319 F.3d 483 (9th Cir. 2003)..............................................................................23

9
*Prime Healthcare Services, Inc. v. Harris*
10   216 F.Supp.3d 1096 (S.D. Cal. 2016) ....................................................23, 24, 25

*R.R. Comm'n of Texas v. Pullman Co.*
11   312, U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) ............................2, 23, 24, 25

12
*RUI One Corp. v. City of Berkeley*
   371 F.3d 1137 (9th Cir. 2003)........................................................................8, 12

13
*San Diego Gas & Electric Co. v. City of Carlsbad*
   64 Cal.App.4th 785 (1998)................................................................................19

14
*Santa Barbara County Taxpayers Ass'n v. Board of Supervisors*
15   209 Cal.App.3d 940 (1980)..................................................................................9

16
*So. Cal. Gas Co. v. City of Alhambra*
   2011 WL 4389655 (C.D. Cal. June 6, 2011)....................................................8, 13

17
*Southern California Gas Co. v. City of Santa Ana*
   336 F.3d 885 (9th Cir. 2003)........................................................................passim

18
*Southern California Gas Co. v. City of Vernon*
   41 Cal.App.4th 209 (1995)...........................................................................19, 20

19
*Tel. & Tel. Co. v. City and County of San Francisco*
20   51 Cal.2d 766 (1959)........................................................................................17

*Trammell v. Western Union Tel. Co.*
21   57 Cal.App.3d 538 (1976).....................................................................................5

22
*University of Haw. Prof'l Assembly v. Cayetano*
   83 F.3d 1096 (9th Cir. 1999)........................................................................12, 14

23
*Urica, Inc. v. Medline Industries, Inc.*
   2012 WL 12884682 (C.D. Cal. May 9, 2012).....................................................13

24

25

**STATUTES**

26
28 U.S.C. § 1367(c)(1) ........................................................................................21

28 U.S.C. § 1367(c)(2) ..................................................................................21, 23

27
Code of Civil Procedure § 1856(c) ....................................................................12

28
Public Utilities Code § 2902 .........................................................................19, 20

4839-3625-9146.3

iii

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

1
2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3   Public Utilities Code § 6203 ......................................................................... 10

4   Public Utilities Code § 6231 ......................................................................... 10

    Public Utilities Code § 6235 ......................................................................... 10

5   Public Utilities Code § 6294 ............................................................... 2, 15, 16

6   Public Utilities Code § 701 ........................................................................... 17

7   Public Utilities Code § 761 ........................................................................... 17

    Public Utilities Code § 762 ........................................................................... 17

8   Public Utilities Code § 768 ........................................................................... 17

9

10

# CONSTITUTIONAL PROVISIONS

California Constitution, Article XII, § 8 ................................................ 16, 17, 20

11  California Constitution, Section 23 ............................................................... 17

12  U.S. Constitution., Article I, § 10, clause 1 .................................................. 8

13

# CALIFORNIA PUBLIC UTILITIES COMMISSION DECISIONS

14  CPUC Decision 01-12-009
15      2001 WL 1719239 (Dec. 11, 2001) .................................................... 18

    CPUC Decision 06-04-055
16      2006 WL 1223107 (Apr. 27, 2006) .................................................... 17

17  CPUC Decision 87278
        81 CPUC 593, 1977 WL 42861 (1977) ............................................. 17

18  CPUC Decision 96-09-012
19      1993 WL 837253 (1996) ................................................................... 19

    *Town of Woodside v. Pacific Gas & Electric Co.*, CPUC Decision
20      88462, 83 CPUC 418, 1978 WL 41896 (1978) ................................. 17

21

# RULES

22  Federal Rule of Civil Procedure 12(b)(6) ................................................. 2, 3

23

24

25

26

27

28

## I.   **PRELIMINARY STATEMENT**

For nearly <u>90</u> years, plaintiff Southern California Edison Company ("SCE") has relied on its franchise agreements with defendant City of Laguna Beach ("City") to install and maintain its aboveground electrical system in the City.  In March 2017, the City adopted Ordinance No. 1622 (the "Undergrounding Ordinance"), requiring the undergrounding of utility facilities, for alleged safety reasons.  It prohibits SCE from installing, replacing, or repairing its aboveground electric system unless the City exercises its discretion to grant permission for SCE to do so under limited circumstances.  This is much more than a mere regulation of the location of facilities.  There are fundamental design and cost differences between installing and maintaining the two types of electric systems.  The City has taken it upon itself to make the design choice of an underground electric system rather than an aboveground system.  By doing so, the City has substantially impaired an essential term in the parties' 1948 franchise agreement (the "Franchise") which grants SCE a franchise to "construct and use for transmitting and distributing electricity to the public for any and all purposes, **poles,** wires, conduits and appurtenances . . . in, along, across, upon, **and** under the public streets, ways, alleys and places within the City of Laguna Beach . . . ."  [Compl., Ex. 1, p. 32, Section 2 (emphasis added).]

The sole basis for the City's motion to dismiss is its contention that, notwithstanding the allegations of the Complaint, SCE's claims for violations of the Contract Clauses of the United States and California Constitutions are based on contract rights that do not exist.  The City's contention that the Franchise does not grant SCE the right to construct, install and maintain its electric facilities aboveground as opposed to underground (Motion at 2:3-3:2) flies in the face of the plain language of the Franchise, the parties' uniform past practice and expectations, and the agreement of the parties' reflected in a 2014 Memorandum of Agreement ("MOA").

1    The City's reliance on its police powers to justify the Undergrounding

2    Ordinance cannot defeat SCE's federal and state claims for unconstitutional

3    impairment of its contractual rights under the Franchise for two reasons.  First, a

4    city cannot avoid a Contact Clause violation merely by relying on its police powers

5    to compromise the material terms of its contracts.  *Southern California Gas Co. v.*

6    *City of Santa Ana*, 336 F.3d 885, 893 (9th Cir. 2003) (per curiam) ("*Santa Ana*").

7    Instead, it must prove that the impairment is both "reasonable and necessary" to

8    fulfill an "important public purpose."  *Id.* at 889-90.  The City has not made, and

9    cannot make, such a showing here.  Second, an exercise of police power must not

10   be in conflict with the paramount authority of the State.  Pub. Util. Code § 6294.

11   The California Public Utilities Commission ("CPUC") has exclusive jurisdiction

12   over the undergrounding of electric facilities precluding any municipal regulation

13   of the subject.  The City has elected not to address this point.

14       In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

15   allegations of the complaint must be taken as true and are construed in the

16   defendant's favor.  Time and time again, the City has ignored this fundamental rule

17   by disagreeing with allegations or ignoring those it finds inconvenient.  The motion

18   to dismiss is without merit and should be denied.

19       The City's request that the Court decline supplemental jurisdiction over

20   SCE's state law claims should also be denied because the City has failed to identify

21   any novel or complex issues of state law that substantially predominate over the

22   federal claims.  The City has also failed to satisfy the requirements for abstention

23   under *R.R. Comm'n of Texas v. Pullman Co*., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed.

24   971 (1941) ("*Pullman*").

25   **II.    THE APPLICABLE LEGAL STANDARDS**

26       "The motion to dismiss for failure to state a claim is viewed with disfavor

27   and is rarely granted."  *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249

28   (9th Cir. 1997).  In ruling on a motion to dismiss under Federal Rule of Civil

4839-3625-9146.3                                    2

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

1   Procedure 12(b)(6), "[a]ll allegations of material fact are taken as true and

2   construed in the light most favorable to the nonmoving party." *Cahill v. Liberty*

3   *Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) (citation omitted).  "In seeking

4   dismissal for failure to state a viable claim, a defendant thus bears the 'very high

5   burden' of showing that the plaintiff cannot conceivably prove any set of facts that

6   would entitle him to relief." *Beck v. Deloitte & Touche*, 144 F.3d 732, 735-36

7   (11th Cir. 1998) (citation omitted).

8   **III.    THE RELEVANT ALLEGATIONS OF THE COMPLAINT**

9           **A.    The Parties and the Franchise**

10          SCE is a publicly regulated utility providing electric service to customers in

11  the City.  [Compl., ¶¶ 3, 8.]  In 1948, the City adopted Ordinance No. 289 granting

12  the Franchise to SCE for an indeterminate term, superseding a 1928 franchise.  [*Id.*,

13  ¶ 11.]  Section 2 of the Franchise provides:

14              The franchise to construct and use for transmitting and

15          distributing electricity to the public for any and all purposes, poles,

16          wires, conduits and appurtenances, including communication circuits

17          necessary or proper therefor, in, along, across, upon **and** under the

18          public streets, ways, alleys and places within the City of Laguna

19          Beach, is hereby granted to Southern California Edison Company,

20          upon the terms and conditions set forth in the Franchise Act of 1937.

21          [*Id.*, ¶ 15; Ex. 1, p. 32 (emphasis added).]

22  "[C]onstruct and use" means "to lay, construct, erect, install, operate, maintain, use,

23  repair or replace."  [*Id.*, § 1(e).]  "[P]oles, wires, conduits and appurtenances" is

24  defined to include "**poles, towers, supports**, wires, conductors, cables, **guys, stubs**,

25  **platforms, [and] crossarms** . . . and any other property located or to be located in,

26  upon, along, across, under or over the streets of the City . . . ."  [*Id.*, pp. 31-32,

27  § 1(d) (emphasis added).]  The highlighted terms are unique to aboveground

28  construction.

1   In consideration for the rights the City granted to SCE, the Franchise requires

2   SCE to pay an annual franchise fee.  [Compl., ¶ 14.]  The Franchise is a binding

3   agreement between SCE and the City and is in full force and effect.  [*Id.*, ¶ 15.]

4   When it granted the present Franchise, the City was aware that under the

5   prior franchise, SCE had installed in the City poles and overhead electric facilities

6   to provide electric service to its customers and regularly repaired, maintained,

7   replaced, and added overhead facilities as needed.  [*Id.*, ¶ 11.]  SCE continued to do

8   so after entering into the Franchise.  [*Id.,* ¶¶ 34-36.]  Most of SCE's facilities in the

9   City consist of overhead poles, wires, and related aboveground equipment.  [*Id.*, ¶

10  34.]  Aboveground facilities carry electricity to customers through wires suspended

11  above ground by poles or towers.  [*Id.*, ¶ 21.]  The design of underground facilities

12  is materially different, and they cost five to ten times more to construct.  [*Id.*]

13  **B.      The Role of the CPUC**

14  The CPUC is a state agency on which the Legislature has conferred broad

15  authority to supervise and regulate public utilities, including standards of

16  construction, maintenance, and operation to promote and safeguard the health and

17  safety of employees, customers, and the public.  [*Id.*, ¶¶ 17.]  It extensively

18  regulates the design, construction, maintenance, inspection, and safety of SCE's

19  electric systems to ensure adequate service and public safety and has established

20  procedures for approval of new projects when required.  [*Id.,* ¶¶ 27, 28.]  Anyone,

21  including the City, who believes that SCE's electric facilities are unsafe may file a

22  complaint with the CPUC which must require corrective action if it concludes the

23  facilities are unsafe.[1]  [*Id.,* ¶ 29.]  The CPUC has affirmatively acted to reduce

24  potential safety hazards, including fire risks, and is currently engaged in a

25  rulemaking proceeding, in which the City has been an active participant, to assess

26

27  [1] Contrary to the City's suggestion, SCE does not agree that its aboveground
    facilities "have a detrimental effect on safety."  [Motion at 1:15-16.]

28

1    the need for additional fire-safety regulations.  [*Id.*, ¶¶ 30-31, 33.]

2         The CPUC has declared that the matter of conversion from overhead to

3    underground electric facilities is "inherently a matter of statewide concern" and has

4    approved an SCE tariff, Tariff Rule 20 ("Rule 20"), establishing the circumstances

5    under which SCE will replace overhead with underground electric facilities.  [*Id.*,

6    ¶¶ 22-24.]  Tariffs, like statutes, have the force of law and are binding on SCE and

7    the City.  *Trammell v. Western Union Tel. Co.*, 57 Cal.App.3d 538, 551 (1976).

8         Part A of Rule 20, provides for public funding of undergrounding under

9    specified circumstances.  Part C authorizes agreements for underground

10   conversions at the applicant's expense.  [*Id.*, ¶¶ 24-25.]  In 2012, the CPUC

11   rejected a proposal to include fire prevention as a basis for undergrounding under

12   part A of Rule 20, noting that "[undergrounding] is perhaps the most expensive fire

13   prevention tool available," "[t]here are many other fire prevention options . . . ,"

14   and "fire risk should be assessed from the standpoint of the utility's entire service

15   territory, and not from the piecemeal and narrow geographical perspectives of

16   individual jurisdictions."  [*Id.*, ¶ 26.]  The CPUC identified an existing procedural

17   mechanism under which it can "consider a range of fire prevention options and

18   select the most cost-effective solutions."  [*Id.*]

19        **C.    SCE's Repair and Replacement Programs**

20        Pursuant to CPUC orders and as needed for safety reasons, SCE replaces

21   deteriorated, damaged, or overloaded utility poles and other equipment.  [*Id.*, ¶ 35.]

22   The CPUC has approved funding for SCE's Deteriorated Pole Replacement

23   Program to identify and replace deteriorated poles.  SCE estimates it will be

24   replacing 29 poles in the City this year.  [*Id.*]  Apart from this program, SCE

25   replaces poles and other equipment immediately or within a short time if a problem

26   requiring prompt action is identified, such as a vehicle hitting a pole, a lightning

27   strike, or failure of a pole-mounted transformer.  [*Id.*]

28        In 2014, SCE and the City entered into the MOA in which the City expressly

1   acknowledged that the CPUC establishes the design requirements for SCE's

2   facilities and that in accordance with state law and a "franchise agreement with the

3   City," SCE has constructed and is responsible for maintaining poles, wires,

4   conduits and appurtenances within the city *and "will continue to make in-kind*

5   *pole replacements for safety reasons* . . . ." [*Id., ¶* 36 (emphasis added).]

6          **D.      The Undergrounding Ordinance and its Effect**

7          Rejecting SCE's legal objections and available alternatives to

8   undergrounding, the City adopted the Undergrounding Ordinance on March 28,

9   2017. [Compl., ¶¶ 4, 37, 38, 55.] It recites the City's assertion that public

10  necessity, health, safety, and welfare "requires the underground installation of new,

11  replacement, and relocated poles, overhead wires and associated overhead

12  structures used for supplying electric, communication, or similar or associated

13  services within the City." [*Id.*, ¶ 39; Ex. 4, p. 48 (first recital).] The

14  Undergrounding Ordinance renders it impractical for SCE to install new overhead

15  facilities or even to replace or repair existing facilities. It purports to require that all

16  new facilities be installed and maintained underground, with limited exceptions for

17  aboveground facilities required as part of an underground system. [*Id., ¶* 38; Ex. 4,

18  p. 50, § 21.25.020.] Even replacement, relocation or reconstruction of existing

19  overhead facilities (including substantial repairs) requires a public hearing before

20  the city council to determine whether public necessity, health, safety, or welfare

21  requires the underground installation of the facilities. The city council's decision is

22  "final and conclusive." [*Id.,* pp. 50-51, §§ 21.25.030, 21.25.050.]

23         If SCE wishes to install, replace, relocate, or reconstruct overhead structures,

24  the Undergrounding Ordinance requires that it provide *six months' prior notice* to

25  the City. [*Id.,* p. 50, § 21.25.040.] If SCE includes a request for an exception with

26  such notice, (a) the city engineer "may grant" an exception to allow, under certain

27  conditions, for the installation, permanent replacement, relocation, or reconstruction

28  of not more than three contiguous poles or "nominal modification" of overhead

equipment, or (b) the city council "may approve" an exception to the requirements of the Undergrounding Ordinance in cases of specified "unusual circumstances." [*Id.,* pp. 50-51, §§ 21.25.040, 21.25.070.]

The Undergrounding Ordinance does not provide for the City's compliance with Rule 20, it does not provide for the City to pay for undergrounding, and the City has not agreed to do so. [Compl., ¶ 42.] Instead, the City seeks to shift the costs to SCE customers, only a fraction of a percent of whom live in the City. [*Id.,* ¶ 43.] In its motion the City appears to hold open the possibility that the City will pay for undergrounding. [Motion at 16: 23-25.] This is disingenuous. If the City were prepared to pay for undergrounding, it could proceed under part C of Rule 20 (Compl., ¶ 25), and this lawsuit would be unnecessary.

The Undergrounding Ordinance materially interferes with SCE's ability to maintain and repair its electric system in compliance with CPUC requirements and tariffs. [*Id.,* ¶ 48.] It is highly probable that the Undergrounding Ordinance will delay maintenance and replacement of poles, transformers, and other equipment to the point of creating safety hazards and detrimentally impacting system reliability. [*Id.,* ¶ 48.] Compliance would also cause a substantial increase in SCE's cost of installing and maintaining its electric facilities in the City, requiring that SCE divert funds that it would otherwise use for needed capital improvements. [*Id.,* ¶ 49.]

**E.     SCE's Complaint**

SCE's Complaint contains claims for injunctive relief for impairment of the Franchise in violation of the Contract Clause of the United States Constitution (First Claim) and the California Constitution (Second Claim), for injunctive relief based on state law preemption of the Undergrounding Ordinance (Third Claim), and for declaratory relief to establish that the Undergrounding Ordinance is invalid and unenforceable against SCE because it violates the federal and state Contract Clauses and is preempted by state law (Fourth Claim).

IV.    **ARGUMENT**

    A.    **SCE Has Stated Claims for Contract Clause Violations[2]**

    In holding that application of a fee ordinance to a public utility operating under a franchise violated the Contract Clause (U.S. Const., Article I, § 10, clause 1), the court in *So. Cal. Gas Co. v. City of Alhambra*, 2011 WL 4389655, at *4 (C.D. Cal. June 6, 2011), provided a concise summary of the elements of the claim:

> Courts apply a three-step inquiry to determine whether a
> regulation violates the Contract Clause: (1) "whether the state law has,
> in fact, operated as a substantial impairment of a contractual
> relationship," *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*,
> 459 U.S. 400, 411, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (citations
> and internal quotation marks omitted); (2) whether the state law is
> justified by a "significant and legitimate public purpose," *id.*; and
> (3) whether the impairment resulting from the law is both "reasonable
> and necessary to fulfill [such] public purpose," *S. Cal. Gas Co. v. City
> of Santa Ana*, 336 F.3d 885, 889–90 (9th Cir. 2003) (per curiam)
> (citations and internal quotation marks omitted).  The threshold inquiry
> of whether the state law has operated as a substantial impairment of a
> contractual relationship is divided into three separate questions:
> (1) "whether there is a contractual relationship"; (2) "whether a change
> in law impairs that contractual relationship"; and (3) "whether the
> impairment is substantial."  *RUI [One Corp. v. City of Berkeley*, 371
> F.3d 1137, 1147 (9th Cir. 2003)].

    Applying this three-step inquiry, the court in *Santa Ana*, upheld summary judgment in favor of the Gas Company because a trench cut ordinance requiring

---

[2] SCE agrees with the City that for purposes of this motion, the same analysis should be applied to the U.S. and California Contact Clauses.  [Motion at 8:23-25.]

payment of a fee for excavations unconstitutionally impaired the Gas Company's franchise rights to install and maintain its facilities under Santa Ana's streets and to repair damage to the streets.  336 F.3d at 892-93.  Specifically, (1) it required that the Gas Company pay an additional fee to exercise its franchise right to lay and use pipes and appurtenances under the city streets, and (2) it imposed the fee regardless of the quality of the Gas Company's repairs.  *Id.* at 891-93.  As discussed below, the court's analysis is particularly instructive in this case.

      1.    **The Franchise is a Contract for Purposes of the Application of the Contract Clause**

The City seems to question whether a franchise is a contract at all, describing it instead as a "special privilege."  [Motion at 2:15-17, 8:21-9:10.]  In fact, it is both.  The court in *In re South Bay Expressway, L.P.*, 434 B.R. 589, 598 (S.D. Cal. July 28, 2010), described a franchise as a "special privilege granted to a private enterprise by a duly-empowered governmental entity to use public property to provide vital public services."  The court proceeded to explain that "***[a] franchise is created by contract***; it grants to the private enterprise a relatively long-term possessory right in public land to provide public services in exchange for payment of franchise fees."  *Id.* at 598 (emphasis added).  *Accord Santa Barbara County Taxpayers Ass'n v. Board of Supervisors,* 209 Cal.App.3d 940, 949 (1980) ("A franchise is a negotiated contract between a private enterprise and a governmental entity for the long-term possession of land.").

In *Santa Ana,* the parties agreed that the franchise at issue was a contract for purposes of the Contract Clause, and the court "concur[red] because it embodies a bargain between Santa Ana and the Gas Company."  *Id.* at 889 (citation omitted). *See also City of Los Angeles v. Los Angeles Gas & Elec. Corp.,* 251 U.S. 32, 40, 40 S.Ct. 76, 79, 64 L.Ed. 121, 127-28 (1919) (franchise for "using the public streets and thoroughfares . . . for introducing into and supplying" Los Angeles with gas light or other illuminating light was protected against impairment by subsequent

1    municipal ordinance); *Grand Trunk Western R. Co. v. City of South Bend*, 227 U.S.

2    544, 551-52, 33 S.Ct. 303, 57 L.Ed. 633 (1913) (Contract Clause protects franchise

3    right to construct railroad through city streets from impairment by subsequent

4    ordinance).

5         The City also suggests that the Franchise is not a contract because the

6    Franchise language on which SCE relies "is a broad, generic phrase, straight out of

7    the Franchise Act of 1937 . . . ." [Motion at 2:19-21, 12:20-21.] The use of

8    statutory language, however, does not preclude the creation of contractual

9    obligations. For example, in *County of Los Angeles v. Southern Cal. Tel. Co.*, 32

10   Cal.2d 378, 381-82 (1948), the court held that **a statute** granting utilities the rights

11   to "construct lines of telegraph, or telephone lines along and upon any public road

12   or highway" and to "erect poles, posts, piers, or abutments for supporting the

13   insulators, wires, and other necessary fixtures of their lines" was, upon acceptance,

14   "effectual to grant a state franchise" and "resulted in a contract between the

15   company and the state which was secured by the federal Constitution against

16   impairment by subsequent state legislation." Moreover, the fact that some of the

17   Franchise's terms are derived from the Franchise Act is irrelevant because, like any

18   contract, the Franchise is a package of terms and conditions, the entirely of which

19   the parties must accept to form a binding agreement. The franchisee must apply for

20   a franchise, the city "may" agree to grant a franchise, and the franchisee must

21   accept the terms before it becomes binding. Pub. Util. Code §§ 6203, 6231, 6235.

22        SCE strongly disagrees with the City's unsupported assertion that "[t]here is

23   no typical bargaining over franchise terms." Public Utilities Code § 6203 provides

24   that "[t]he legislative body may in such a franchise impose such other and

25   additional terms and conditions not in conflict with this chapter, whether

26   governmental or contractual in character, as in the judgment of the legislative body

27   are to the public interest." Such terms are negotiated, as reflected by the fact that

28   the Franchise includes provisions that do not appear in the Franchise Act, such as

1    an expansive definition of "poles, wires, conduits, and appurtenances" to include

2    the types of aboveground facilities the parties contemplated (Compl., Ex. 1, § 1(d)),

3    inclusion of SCE's right to construct and use "communication circuits" (*id.*, § 2),

4    and detailed payment provisions (*id.*, § 5).  Even the City's franchise agreements

5    with SCE and San Diego Gas & Electric Company materially differ.  For example,

6    Sections 6 and 8(a) of the SDG&E franchise do not have a counterpart in the SCE

7    Franchise.  *See* SCE's Request for Judicial Notice, Ex. 1, pp. 11-13; Compl., Ex. 1.

8        The cases the City relies on to suggest a franchise is not a contract (Motion at

9    9:3-23) addressed franchises in entirely different contexts.  They did not address

10   whether the franchise at issue was a contract and did not consider infringement of

11   express franchise rights.  For example, the City quotes language out of context from

12   *City of Santa Cruz v. Pacific Gas & Electric Co.*, 82 Cal.App.4th 1167, 1176-77

13   (2000), describing a "complementary franchise" that was not subject to negotiation.

14   *County of Sacramento v. Pacific Gas & Electric Co.*, 193 Cal.App.3d 300 (1987),

15   involved the interpretation of a statute that set the fee a franchisee must pay, which

16   was a matter of statutory, not contractual, interpretation.  *Id.* at 303, 308 n. 5.

17       2.    **The Franchise Grants SCE the Rights to Install, Maintain,**

18             **Replace, and Repair Aboveground Electric Facilities**

19       Section 2 of the Franchise, quoted at page 3 above, is a grant to SCE of

20   franchise rights to install, maintain, repair or replace its equipment — including

21   poles, towers, wires, conductors and other facilities — along, across, upon and

22   under the public streets, ways, alleys and places within the City.  It is ludicrous for

23   the City to contend that the language of the Franchise "does not establish a right to

24   place the poles, wires, and structures above or on the streets as opposed to below

25   the streets . . . ."  [Motion at 2:26-27.]  It is hard to believe that the City seriously

26   contends that SCE should install poles and towers underground.

27       The court in *Santa Ana* held that a franchise gave the Gas Company "the

28   ***right*** to conduct excavations without paying an additional fee," and that "[i]f Santa

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4839-3625-9146.3                    11

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

1    Ana can unilaterally increase the cost of exercising this right, then the 1938

2    Franchise does not secure the **principal right** it was designed to convey."  *Id.* at 891

3    (emphasis added).  SCE's right to install and maintain poles and lines above ground

4    is comparable to the Gas Company's right to access areas under the streets by

5    excavations and is just as fundamental.

6          The City argues that ambiguities "are construed in favor of the public and

7    against the franchisee."  [Motion at 9:24-28.]  Here, there is no ambiguity because

8    the Franchise gives SCE the express right to install poles and other aboveground

9    equipment along, across, and upon City rights of way and other property.

10   Moreover, the MOA, which the City does not even mention in its motion, expressly

11   recognizes SCE's franchise rights to maintain poles, wires, conduits, and

12   appurtenances within the City and to make in-kind pole replacements.

13         In addition, the parties' course of dealing can create contractual expectations

14   protected by the Contract Clause.  For example, in *University of Haw. Prof'l*

15   *Assembly v. Cayetano*, 183 F.3d 1096, 1102 (9th Cir. 1999), the court held that the

16   parties' 25-year "course of dealing" regarding the timing of payments to public

17   employees created a "contractual expectation" that was protected by Contract

18   Clause.  *Cf.* Code of Civ. Proc. § 1856(c) (terms in a writing "may be explained or

19   supplemented by course of dealing . . . or by course of performance.").  In *Santa*

20   *Ana,* the court adopted the Gas Company's interpretation of the parties' franchise,

21   noting among other things, that the parties' "past practice" was inconsistent with

22   Santa Ana's interpretation.  Specifically, the parties had conducted business for

23   over 50 years without a trench cut fee.  *Id.* at 891-92 and n. 7.  In describing its

24   holding in *Santa Ana,* the Ninth Circuit in *RUI One Corp. v. City of Berkeley*, *supra,*

25   371 F.3d at 1137, 1149, explained:

26         Although the 1938 contract did not specifically forbid the city from

27         imposing such fees, we noted that a fair reading of its terms, coupled

28         with years of past practice, conferred on the utility a right to excavate

1    below city streets and repair any damage it creates in the process . . . .

2    Similarly, in the present case, the parties' past practice for nearly 90 years confirms

3    SCE's right to install, replace, and repair its aboveground facilities without the

4    City's interference.

5         Finally, even if there were any ambiguity, a motion to dismiss is not the

6    appropriate means to resolve it.  *See, e.g.*, *Consul Ltd. v. Solide Enterprises, Inc.*,

7    802 F.2d 1143, 1149 (9th Cir. 1986) (finding the district court erred in granting a

8    motion to dismiss where the parties' intent was ambiguous); *Catena v. Capitol*

9    *Records, LLC*, 2012 WL 12942740, at *3 (C.D. Cal. July 11, 2012) ("If the

10   contract's terms are reasonably susceptible of more than one meaning, however, the

11   motion [to dismiss] must be denied."); *Urica, Inc. v. Medline Industries, Inc.*, 2012

12   WL 12884682, a t *6 (C.D. Cal. May 9, 2012) ("courts cannot grant motions to

13   dismiss when the contract is ambiguous").  *Cf. Insco Ins. Services, Inc. v. Federal*

14   *Ins. Co.*, 2016 WL 7486283, at *7 (C.D. Cal. Apr. 1, 2016) ("[A]t the motion to

15   dismiss stage, '[the Court must] strive to resolve any contractual ambiguities in the

16   [non-moving party's] favor.'"  (Citation omitted)).

17         3.    **The Undergrounding Ordinance Substantially Impairs**

18              **SCE's Rights Under the Franchise**

19         The City attempts to distinguish *Santa Ana* and *So. Cal. Gas Co. v. City of*

20   *Alhambra, supra,* on the ground that the ordinances at issue impaired an existing

21   financial term by imposing additional fees.  [Motion at 17:13-18:6.]  The Contract

22   Clause is not limited to impairments of a financial term.  "An impairment of a

23   public contract is substantial if it deprives a private party of an important right,

24   thwarts performance of an essential term, defeats the expectations of the parties, **_or_**

25   alters a financial term."  *Santa Ana,* 336 F.3d at 890 (internal citations omitted;

26   emphasis added).  *See also Grand Trunk Western R. Co. v. City of South Bend*,

27   *supra,* 227 U.S. at 551, 558-59 (city materially impaired railroad company's rights

28   to lay a double track over a part of a street by purporting to withdraw the right

1    before the company had extended it for the authorized distance).  The

2    Undergrounding Ordinance substantially impairs an essential term, namely SCE's

3    right to install, maintain, repair, and replace its facilities "along, across, [and] upon"

4    the public streets and other places within the City without the City's interference.

5    The grant of such rights is meaningless, and the parties' expectations are defeated,

6    if the City can unilaterally withdraw them and force SCE to engage in the much

7    more expensive and lengthy process of undergrounding its electric facilities.

8         The Undergrounding Ordinance also thwarts SCE's performance by erecting

9    cumbersome and time-consuming hurdles to aboveground installations, repairs, and

10   replacements, including a six months' notice requirement, public hearings, and a

11   limited discretionary exception process.  The Undergrounding Ordinance requires

12   SCE to comply with the City's burdensome procedures even if a deteriorated pole

13   or a downed wire presents an immediate safety hazard or affects service to SCE's

14   customers.  Even if SCE were to satisfy every procedural step required to obtain

15   permission to install, replace, or repair its overhead facilities, the City can simply

16   decide to require undergrounding.  Thus, the City has effectively foreclosed

17   aboveground installations, replacements, and repairs unless SCE is willing to accept

18   lengthy delays due to the six-month prior notice requirement, it successfully

19   navigates the burdensome hearing and exception process the City has erected, and

20   the City elects to exercise its discretion in SCE's favor.  In addition, when

21   compared with aboveground construction, undergrounding dramatically increases

22   SCE's construction costs and delays completion of construction.

23        This case involves a much more egregious impairment than in *Santa Ana*,

24   which merely involved a new fee.  The impairment is also much more substantial

25   than in *University of Haw. Prof'l Assembly v. Cayetano*, *supra,* 183 F.3d at 1100-

26   08, where the court held that the parties' course of dealing under a collective

27   bargaining agreement created a contractual expectation that plaintiffs would be paid

28   on the fifteenth and thirtieth each month and that plaintiffs had shown a

1   likelihood of prevailing on their claim that subsequent legislation delaying payment

2   by *up to three days* violated the Contract Clause.

3           4.    **The Undergrounding Ordinance is Not a Valid Exercise of**

4                  **the City's Police Powers**

5        In *Santa Ana*, Santa Ana argued, as the City does here, that there is no

6   impairment because the franchise allegedly subjects the Gas Company to all

7   ordinances "heretofor or hereafter adopted . . . in the exercise of [Santa Ana's]

8   police powers . . . ."  336 F.3d at 893.  The court rejected the police power

9   justification:

10          Santa Ana cannot avoid Contract Clause analysis merely by

11         establishing that the trench cut ordinance is an otherwise legitimate

12         exercise of police power.  While the 1938 Franchise may acknowledge

13         the need for further regulation pursuant to Santa Ana's police power, it

14         does not enable Santa Ana to adopt ordinances that compromise its

15         material terms.  We cannot read the 1938 Franchise in a way that

16         reserves to Santa Ana the power to unilaterally alter the terms of the

17         agreement.  Such an interpretation is "absurd" . . . .  [*Id*. at 893

18         (footnote and citation omitted).]

19        As noted above, Section 2 of the Franchise provides that the grant is "upon

20   the terms and conditions set forth in the Franchise Act of 1937."  The City relies on

21   Public Utilities Code § 6294, a part of the Franchise Act, which provides:

22          The grantee of a franchise under this chapter shall construct,

23         install, and maintain all pipes, conduits, poles, wires, and

24         appurtenances in accordance and in conformity with all of the

25         ordinances and rules adopted by the legislative body of the

26         municipality in the exercise of its police powers and not in conflict

27         with the paramount authority of the State . . . .

28   As in *Santa Ana*, even if the Undergrounding Ordinance were an otherwise

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4839-3625-9146.3

15

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION

1  legitimate exercise of police power, § 6294 cannot be read to reserve to the City the
2  power to unilaterally alter material terms of the parties' agreement.

3  The City attempts to distinguish *Santa Ana* on the ground that there was no
4  public safety reason for Santa Ana's ordinance; it was merely a revenue-raising
5  measure. [Motion at 18:24-26.] However, Santa Ana produced evidence that
6  excavations reduced the useful life of streets and that it had adopted the ordinance
7  to raise revenues to repair and maintain its streets and to ensure better pre-
8  excavation coordination with the utility. *Santa Ana*, 336 F.3d at 897. The court did
9  not question the "usefulness or practicality" of the ordinance (*id.*) and assumed that
10  it was a valid exercise of Santa Ana's police powers (*id.* at 893 n. 8). Nevertheless,
11  the court found a Contract Clause violation as a matter of law. *Id.* at 897.

12  SCE alleges in its Contract Clause claims that the City was not entitled to
13  apply the Undergrounding Ordinance to SCE because it "would effectively
14  eliminate material terms of the Franchise," **and** it "is in conflict with the paramount
15  authority of the State . . . ." [Compl., ¶¶ 54, 61.] The City has ignored the fact that
16  by its terms, § 6294 is limited to ordinances "***not in conflict with the paramount***
17  ***authority of the State*** . . . ." In entering into the Franchise and making it subject to
18  the Franchise Act, the parties necessarily expected that SCE would only be subject
19  to ordinances that were not in conflict with the paramount authority of the state. It
20  would defeat the parties' expectations in violation of the Contact Clause if the City
21  were to act in contravention of state authority. *See Santa Ana,* 336 F.3d at 890.

22  The Undergrounding Ordinance conflicts with the paramount authority of the
23  State, acting through the CPUC, and is therefore preempted. ***The City elected not***
24  ***to address this issue in its motion.*** [Motion at 1:22-23.] Pursuant to Article XII, §
25  8 of the California Constitution, ***"[a] city, county, or other public body may not***
26  ***regulate matters over which the Legislature grants regulatory power to the***
27  ***[Public Utilities] Commission."*** [Emphasis added.] As discussed above, the
28  Legislature has expressly delegated to the CPUC authority to address the

construction and design of the facilities public utilities use to provide service to their customers, and the CPUC has exercised that authority by regulating the undergrounding of electrical facilities.  In addition, Rule 20, which has the effect of law, governs conversions from overhead to underground facilities.

"Both the Commission and the California courts have repeatedly reaffirmed the Commission's *exclusive jurisdiction* over public utility facilities and operations. Such matters as the location of lines, their electrical and structural adequacy, *their safety*, and their meeting of the needs of the public within this state are clearly, by law, subject to the jurisdiction of this Commission."  CPUC Decision 06-04-055, 2006 WL 1223107, at *3 (Apr. 27, 2006) (emphasis added; internal quotations and citations omitted).  *See also Tel. & Tel. Co. v. City and County of San Francisco*, 51 Cal.2d 766, 774 (1959) (city may not exclude telephone lines from certain streets on the theory "it is a municipal affair"); *California Water and Tel. Co. v. County of Los Angeles,* 253 Cal.App.2d 16, 30 (1967) (because the construction, design, operation and maintenance of public water utilities is a matter of statewide concern, county's water ordinance was pre-empted by the authority vested in the CPUC).

The CPUC has also declared that "[t]he conversion of utilities overhead to underground in this state is inherently a matter of statewide concern, and the regulatory scheme set forth in Section 23 of the California Constitution [now Article XII, § 8] and Sections 701, 761, 762, and 768 of the Public Utilities Code fully occupies the conversion field."  CPUC Decision 87278, 81 CPUC 593, 1977 WL 42861 at *4 (1977).

*Town of Woodside v. Pacific Gas & Electric Co.,* CPUC Decision 88462, 83 CPUC 418, 1978 WL 41896 (1978) ("*Town of Woodside*"), involved an attempt by a town to use its police power to regulate whether electric facilities should be placed above or below ground, and is directly analogous to this case.  The Town of Woodside filed a complaint with the CPUC to compel a public utility to comply with the town's undergrounding ordinance.  The ordinance permitted replacement

or relocation of overhead electric distribution facilities with different overhead facilities "when the Planning Commission finds that such replacement or relocation will not impede achievement of the Town's objective of having all utilities placed underground[.]" *Id.* at *3. In rejecting the complaint, the CPUC held that "[t]he regulation of [the utility's] electric distribution facilities, including those in Woodside, is a matter of statewide concern and within the exclusive jurisdiction of the Commission." *Id.* at *6. The CPUC directed the utility to proceed with the replacement of deteriorated poles "as soon as possible." *Id.* at *7.

Similarly, in *City of Anaheim v. Pacific Bell Tel. Co.*, 119 Cal.App.4th 838 (2004), the city adopted an ordinance requiring a public utility to underground its facilities. When the utility refused to pay for undergrounding, the city paid under protest and sued to recover the cost. *Id.* at 842. In reviewing the superior court's dismissal for lack of jurisdiction, the court of appeal observed that "it is plain the claims asserted in this case concern a matter about which the PUC is authorized to make policy, over which it has assumed jurisdiction, and which it continues to regulate." *Id.* at 844 (citations omitted). The court referred to a statement by the CPUC that "conversion funds are limited, creating 'the equitable issue of how to balance those who receive the benefits of undergrounding against those who pay the cost.'" *Id.* at 844-45 (citing CPUC Decision 01-12-009, *mimeo* at 9, 2001 WL 1719239 (Dec. 11, 2001)). The court then stated that "[i]t is reasonable to conclude the PUC will continue to oversee and regulate where and when utility facilities are put underground for the foreseeable future." 119 Cal.App.4th at 845. The court noted that "[t]he PUC 'has been held to have paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that of a local government involving a matter of statewide concern . . . .'" *Id.* (citation omitted). The court upheld the judgment of dismissal because "this action has the potential to interfere with the equitable determination of the order in which communities throughout the state should have their overhead facilities moved underground, a

matter of statewide concern over which the PUC has jurisdiction." *Id.* at 846.  *Cf.* CPUC Decision 96-09-012, 1993 WL 837253 at *10 (1996) (city has no authority over design and siting of electric transmission facilities and may not require utility to obtain a discretionary permit to construct them, citing *Town of Woodside*); *San Diego Gas & Electric Co. v. City of Carlsbad*, 64 Cal.App.4th 785, 802-03 (1998) ("City's requirement of a special use permit for dredging, placing conditions on the exercise of SDG&E's right to dredge, on its face places a significant physical and economic burden on SDG&E's operation and maintenance of its facilities" and is preempted).

The City's reliance on Public Utilities Code § 2902 as a confirmation of its police powers to require undergrounding fares no better.  The Undergrounding Ordinance does not merely regulate the location of poles and other electric equipment on public rights of way.  Instead, it dictates that SCE design and install an underground rather than an aboveground system.  *Southern California Gas Co. v. City of Vernon*, 41 Cal.App.4th 209 (1995)*,* is instructive.  In that case, the city attempted to regulate the depth of underground gas pipes.  The court stated that "[t]he essential issue presented is whether Vernon can purport to regulate the design and construction of a proposed gas pipeline, notwithstanding the California Public Utilities Commission's (the PUC) regulatory power in this area."  41 Cal.App.4th at 211-12.  The court held:

> In sum, under the Constitution a city may not regulate matters over which the PUC has been granted regulatory power, the Legislature has granted regulatory power to the PUC over the safety of gas pipelines, and the PUC in fact has promulgated rules on this subject.  Therefore, Vernon cannot purport to regulate the design or construction of the proposed pipeline under the guise of ensuring the pipeline's safety.
>
> The goal of statewide uniformity in this area would be defeated

1       if a municipality such as Vernon could enlarge upon the standards

2       promulgated by the PUC in its General Order.  If Vernon believes the

3       PUC's standards are inadequate, it should direct its concerns to that

4       entity.  [*Id.* at 217.]

5  The court held that the city's reliance on Public Utilities Code § 2902 was

6  "unavailing" because in light of the constitutional provision (Cal. Const., Article

7  XII, § 8) and statutes conferring authority over safety issues to the CPUC, "design

8  and construction of the proposed pipeline are matters within the regulatory purview

9  of the PUC, not the municipality."  *Id.* at 215-18.

10      Similarly, the City's police powers do not extend to requiring

11  undergrounding because the CPUC's exercise of exclusive jurisdiction over the

12  undergrounding of electric facilities and safety issues falls squarely within the

13  scope of the authority the Legislature granted to it.

14             5.    **The Undergrounding Ordinance is Not Reasonable or**

15                  **Necessary to Fulfill an Important Public Purpose**

16      Even if the City were correct that its police powers extend to requiring the

17  undergrounding of electric facilities, the City's motion should be denied because it

18  has not demonstrated that the ordinance is ***both*** reasonable and necessary to fulfill

19  an important public purpose.  *See Santa Ana*, 336 F.3d at 889-90.  The allegations

20  of the Complaint are to the contrary.  [Compl., ¶ 55.]

21      In *Santa Ana*, the court concluded that the ordinance at issue was not

22  reasonable for two reasons.  First, "an 'impairment is not a reasonable one if the

23  problem sought to be resolved by an impairment of the contract existed at the time

24  the contractual obligation was incurred.'  Changed circumstances and important

25  government goals do not make an impairment reasonable if the changed

26  circumstances are 'of degree and not kind.'"  *Id.* at 895 (citations omitted).  The

27  ordinance in *Santa Ana* sought to compensate the city for harms that were foreseen

28  when the parties entered into the franchise agreement.  *Id.* at 896.  Second, Santa

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4839-3625-9146.3               20

1    Ana's desire to shift costs to the utility and to improve coordination deserved only

2    "slight consideration" and was not sufficient to warrant the extent of its

3    infringement of the parties' contract.  *Id*. at 896.  Finally, a city cannot satisfy its

4    "heavy burden" of showing necessity where there are "more moderate alternatives,"

5    or it can accomplish its purpose by using its own financial resources without

6    "imposing additional financial burdens on a private party."  *Id.* at 896-97.  Santa

7    Ana could defray its costs through other more moderate alternatives, including

8    higher taxes and budget restrictions.  *Id.* at 896-97.  Its higher costs did not make

9    the impairment necessary.  *Id.* at 897.

10        Similarly, the City cannot satisfy its heavy burden of demonstrating that the

11   Undergrounding Ordinance is both reasonable and necessary to fulfill an important

12   public purpose.  There is nothing new about the risk that an out-of-control car may

13   hit a power pole, or that a downed electric line may cause a fire.  As in *Santa Ana,*

14   the Undergrounding Ordinance is not a reasonable response because any changed

15   circumstances are "of degree and not kind."  Also, SCE has proposed reasonable

16   alternatives to undergrounding.  [*See* Compl., ¶¶ 4, 33, 37.]  Compare *Lozano v.*

17   *Pacific Gas & Elec. Co.*, 70 Cal.App.2d 415, 442 (1945) (electric utility could have

18   prevented an accident by improving insulation, increasing the height above ground,

19   adding barriers, or by running wires underground.).  As the CPUC has noted,

20   undergrounding "is perhaps the most expensive fire-prevention tool available," and

21   "[t]here are many other fire-prevention options . . . ."  [Compl., ¶ 26.]  In addition,

22   the City can apply for undergrounding at its own expense under part C of Rule 20.

23        **B.**    **The Court Should Not Decline to Exercise Supplemental**

24              **Jurisdiction**

25        The City contends that the Court "should decline supplemental jurisdiction

26   and stay the federal claims because . . . the Utility tries to position [the state law

27   claims] as raising 'novel or complex' issues of state law (28 U.S.C. § 1367(c)(1))

28   which 'substantially predominate' over the federal claim (*id*. § 1367(c)(2))."

1   [Motion at 19:22-26.]  SCE has never made this assertion.  Even the City does not

2   contend that SCE's state claims raise "novel or complex" issues of state law.

3   Instead, the City "maintains the state law claims are without basis . . . ."  [*Id.* at

4   19:23-24.]

5        There are no novel or complex state law issues.  As the City concedes, SCE's

6   state Contract Clause claim merely parallels its federal Contract Clause claim.

7   [Motion at 8, n. 2.]  SCE's preemption claims, which the City elected not to address

8   at all, are based on well-established legal principles governing the CPUC's

9   exclusive jurisdiction.  As discussed above, both the CPUC and California courts

10  have repeatedly addressed and reaffirmed the CPUC's exclusive authority to

11  regulate public utility facilities and operations, and the CPUC has exercised its

12  exclusive jurisdiction over the undergrounding of electrical equipment.

13       Nor do SCE's state claims "substantially predominate" over its federal

14  claims.  Courts will exercise supplemental jurisdiction over the state claims where,

15  for example, resolution of a plaintiff's "state and federal claims will both depend on

16  findings and conclusions regarding the nature of Defendants' actions and [the rights

17  at issue]," and "require consideration of similar facts and issues."  *Bavand v. One*

18  *West Bank FSB,* 2012 WL 1884668, at *4 (W.D. Wash. May 22, 2012).  *See also*

19  *Housing Rights Center, Inc. v. Moskowitz*, 2004 WL 3738293, at *4 (C.D. Cal.

20  Sept. 20, 2004) (exercising supplemental jurisdiction over plaintiffs' state claims

21  where both claims "derive from a common nucleus of operative fact" and sought

22  the same remedies).  Here, SCE seeks injunctive and declaratory relief for both its

23  federal and state claims, and they are based on common facts and overlapping legal

24  issues.  These factors also support the exercise of supplemental jurisdiction over

25  SCE's state law claims in the interests of judicial economy, convenience, fairness,

26  and comity.  *See, e.g.*, *Brenek v. Town of Griswold,* 2010 WL 2293173, at *3 (D.

27  Conn. June 3, 2010) (considering these interests in deciding to exercise

28  supplemental jurisdiction where plaintiff alleged the same facts to support her

federal and state claims and the claims involved the same conduct and damages).

In *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3rd Cir. 1995), the court stated:

> When a district court exercises its discretion not to hear state claims
> under § 1367(c)(2), the advantages of a single suit are lost.  For that
> reason, § 1367(c)(2)'s authority should be invoked only where there is
> an important countervailing interest to be served by relegating state
> claims to the state court.  This will normally be the case only where "a
> state claim constitutes the real body of a case, to which the federal
> claim is only an appendage," only where permitting litigation of all
> claims in the district court can accurately be described as allowing a
> federal tail to wag what is in substance a state dog.  [Citation omitted.]

*Accord Housing Rights Center, Inc. v. Moskowitz*, *supra,* 2004 WL 3738293, at *4. The discussion in this opposition demonstrates that the federal Contract Clause claims stand on their own and are not mere appendages to the state claims.

### C.    The City Has Not Satisfied the Requirements for *Pullman* Abstention

The City requests that in the alternative, the Court should stay adjudication of SCE's federal impairment claim and dismiss state claims under *Pullman*.  [Motion at 20:17-22:12.]  The "*Pullman* abstention doctrine 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy' that is properly before it."  *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (citation omitted). *See also Prime Healthcare Services, Inc. v. Harris*, 216 F.Supp.3d 1096, 1126 (S.D. Cal. 2016) ("The *Pullman* abstention allows district courts, in *exceptional* cases, to postpone the exercise of jurisdiction."  (Emphasis in original)).  "In order to 'give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims,' *Pullman* abstention should rarely be applied."  *Porter,* 319 F.3d at 492 (9th Cir. 2003) (citation omitted).

1    *Pullman* abstention is appropriate "only if each of the following three factors

2    is present: '(1) the case touches on a sensitive area of social policy upon which the

3    federal courts ought not enter unless no alternative to its adjudication is open,

4    (2) constitutional adjudication plainly can be avoided if a definite ruling on the state

5    issue would terminate the controversy, and (3) [the proper resolution of] the

6    possible determinative issue of state law is uncertain." *Id*. at 492 (citations

7    omitted).  "[T]he absence of <u>any one</u> of these three factors is sufficient to prevent

8    the application of *Pullman* abstention."  *Id*. at 492 (emphasis added).

9    The City contends that "[d]epending upon a court's review of the various

10   provisions of California's PUC—the rights the PUC confers on a grantee—the

11   federal Contract Clause claim could be mooted or narrowed."  [Motion at 21:26-

12   28.]  If the City is referring to whether under the Franchise, SCE has the right to

13   construct and maintain its facilities above ground, this Court is well-equipped to

14   address that issue, just as the court in *Santa Ana* determined the Gas Company's

15   rights under the franchise at issue in that case.  If the issue is not the existence of

16   the right itself, but whether it can be limited by the Undergrounding Ordinance

17   adopted pursuant to the City's police powers, this Court can decide that the

18   Undergrounding Ordinance is preempted under well-settled state law.  There is no

19   <u>uncertain</u> issue of state law.

20   The City has not identified any uncertain issue of state law that would be

21   determinative of the Contract Clause claims.  Instead, the City leaves it to the Court

22   do so.  The City states that "[i]f the Court determines that the state law issues are

23   unsettled, the third [*Pullman*] factor would be present . . . ."  [Motion at 22:10-11.]

24   In *Prime Healthcare Services, Inc. v. Harris*, 216 F.Supp.3d 1096, 1126 (S.D. Cal.

25   2016), the defendant requested that the court abstain from adjudicating a federal

26   dispute under *Pullman*.  The court declined to do so, noting that the defendant

27   "[did] not sufficiently identify a determinative issue of state law or articulate why

28   the resolution of the issue is uncertain," did not "adequately articulate how [the

state law issue] would 'terminate the controversy' and result in the conclusion that 'constitutional adjudication plainly can be avoided,' and did not "sufficiently explain why the resolution of this state law issue is uncertain." *Id.* at 1127.  *See also Detroit Memorial Park Ass'n, Inc. v. City of Detroit Bd. of Zoning Appeals*, 105 F.Supp.3d 769, 777 (E.D. Mich. 2015) (denying request to abstain under *Pullman* where defendants "have not identified any unclear state laws that are at issue").  *Accord Hancock v. City of Ridgefield, Wash.*, 2009 WL 4110804, at 2 (W.D. Wash. Nov. 23, 2009); *Kelly v. Lopeman*, 680 F.Supp. 1101, 1106 (S.D. Ohio 1987).  Similarly, the City's failure to "identify a determinative issue of state law" and "sufficiently explain why the resolution of [a] state law issue is uncertain" (*id.* at 1127) alone precludes application of the *Pullman* doctrine.

# V.    **CONCLUSION**

SCE has pled all of the elements of a Contract Clause violation.  The City, like any other governmental entity, must respect its contractual obligations.  None of the arguments it has presented demonstrate that SCE has failed to state claims for violation of the United States and California Contract Clauses.  The City has also failed to provide sufficient grounds for dismissing SCE's state law claims or staying this action on the basis of *Pullman* abstention.  Accordingly, the City's motion should be denied in its entirely.


Dated:  June 27, 2017                              Respectfully submitted,

Carlsmith Ball LLP


By:  */s/ James Polish*
James Polish
Attorneys for Plaintiff
Southern California Edison
Company

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4839-3625-9146.3

25

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS OR STAY ACTION