1  RONALD B. TUROVSKY (Bar No. CA 112140)
   E-mail: rturovsky@manatt.com
2  DAVID L. HUARD (Bar No. CA 110718)
   E-mail: dhuard@manatt.com
3  DONALD R. BROWN (Bar No. CA 156548)
   E-mail: dbrown@manatt.com
4  ALEXANDRA N. HILL (Bar No. CA 313249)
   E-mail: ahill@manatt.com
5  MANATT, PHELPS & PHILLIPS, LLP
   11355 West Olympic Boulevard
6  Los Angeles, CA  90064-1614
   Telephone:  (310) 312-4000
7  Facsimile:   (310) 312-4224

8  PHILIP D. KOHN (Bar No. CA 90158)
   E-mail: pkohn@rutan.com
9  City Attorney, CITY OF LAGUNA BEACH
   WILLIAM M. MARTICORENA (Bar No. CA 77309)
10 E-mail: bmarticorena@rutan.com
   RUTAN & TUCKER, LLP
11 611 Anton Boulevard, 14th Floor
   Costa Mesa, CA 92626
12 Telephone: (714) 641-3415
   Facsimile: (714) 546-9035

13
   *Attorneys for Defendant*
14 City of Laguna Beach

15              UNITED STATES DISTRICT COURT

16            CENTRAL DISTRICT OF CALIFORNIA

17

18 SOUTHERN CALIFORNIA          | Case No.  8:17-cv-00618-JVS-DFM
   EDISON COMPANY, a California  |
19 Corporation,                 | **DEFENDANT'S REPLY
                                 | MEMORANDUM OF POINTS AND
20              Plaintiff,       | AUTHORITIES IN SUPPORT OF
                                 | MOTION TO DISMISS OR STAY
21        vs.                    | ACTION**
                                 |
22 CITY OF LAGUNA BEACH, a       | **Hon. James V. Selna**
   Municipal California corporation, |
23                              | Courtroom: 10-C
                Defendant.       | Date: July 24, 2017
24                              | Time: 1:30 pm
25                              | Action Filed:     April 5, 2017

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   LEGAL STANDARD ........................................................................... 4

III.  ARGUMENT ....................................................................................... 5

   A.   The Utility's Impairment Of Contract Claims Should Be
      Dismissed ..................................................................................... 5

      1.   The Utility Does Not Contest That Government
         Franchises Are Special Rights Granted For The Benefit
         Of The Public .................................................................... 5

      2.   The Utility Cannot Show The Impairment Of Any Term .......... 5

         a.   The Franchise Does Not Give The Utility The
            Right To Install And Maintain Equipment Above
            Ground Or Underground Without The City's
            "Interference." ........................................................ 6

            (i)    No Express Term Has Been Impaired ................. 6

            (ii)   The Utility Does Not Have The Unilateral
                Right To Decide Whether To Underground
                Based On "Course Of Dealing." ............................ 9

         b.   There Is No Impairment Because Of What The
            Utility Calls "Cumbersome And Time-Consuming
            Hurdles." ................................................................ 13

         c.   The Utility's Preemption Argument Is Not A Basis
            For A Contract Clause Claim ................................. 14

         d.   There Is No Impairment Of Contract Because Of
            An Alleged Increase In The Utility's Costs ................. 16

         e.   The MOA Does Not Establish An Impairment
            Claim .................................................................... 16

      3.   The *Santa Ana* And *Alhambra* Cases Are Distinguishable ...... 16

      4.   Other Arguments Made By The Utility Are Irrelevant ........... 17

      5.   The Court Should Decline To Exercise Supplemental
         Jurisdiction ...................................................................... 18

   B.   Alternatively, The Court Should Abstain And Stay Or Dismiss
      The Action .................................................................................. 21

IV.  CONCLUSION ................................................................................... 23

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

\- i -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................. 4

*Bell Atlantic v. Twombly,*
    550 U.S. 544 (2007) ................................................................. 4

*Borough of West Mifflin v. Lancaster,*
    45 F.3d 780 (3d Cir. 1995) ..................................................... 20

*Brenek v. Town of Griswold,*
    2010 WL 2293173 (D. Conn. Jun. 3, 2010) ........................... 20

*Cedar Shake and Shingle Bureau v. City of Los Angeles,*
    997 F.2d 620 (9th Cir. 1993) .................................................. 19

*City of Anaheim v. Pac. Bell Tel. Co.,*
    119 Cal. App. 4th 838 (2004) ................................................. 19

*Copt-Air v. City of San Diego,*
    15 Cal. App. 3d 984 (1971) ...................................................... 3

*Detroit Mem'l Park Ass'n, Inc. v. City of Detroit Bd. of Zoning
    Appeals,*
    105 F. Supp. 3d 769 (E.D. Mich. 2015) ........................... 21, 22

*Gen. Motors Corp. v. Romein,*
    503 U.S. 181 (1992) ........................................................... 1, 10

*Hancock v. City of Richfield, Wash.,*
    2009 WL 4110804 (W.D. Wash. Nov. 23, 2009) .................. 22

*Housing Rights Ctr., Inc. v. Moskowitz,*
    2004 WL 3738293 (C.D. Cal., Sept. 20, 2004) ..................... 19

*Kelly v. Lopeman,*
    680 F. Supp. 1101 (S.D. Ohio 1987) ..................................... 22

*Maui Land & Pineapple Co. v. Cty. of Maui,*
    2010 WL 1372416 (D. Haw. Mar. 31, 2010) ......................... 13

*Moss v. United States Secret Serv.,*
    572 F.3d 962 (9th Cir. 2009) .................................................... 4

*NextG Networks of Cal. v. City of Huntington Beach,*
    No. 8:07-cv-01471 (C.D. Cal Feb. 23, 2009) ......................... 4

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Pac. Bell Tel. Co. v. City of Walnut Creek,*
   428 F. Supp. 2d 1037 (N.D. Cal. 2006)........................................ 18, 21

*Prime Healthcare Servs., Inc. v. Harris,*
   216 F. Supp. 3d 1096 (S.D. Cal. 2016) ............................................. 21

*Qwest Commc'ns Corp. v. City of Berkeley,*
   146 F. Supp. 2d 1081 (N.D. Cal. 2001)............................................. 18

*R.R. Comm'n of Texas v. Pullman Co.,*
   312 U.S. 496 (1941) .........................................................3, 21, 22

*RUI One Corp. v. City of Berkeley,*
   371 F.3d 1137 (9th Cir. 2004)...................................................passim

*S. Cal. Edison Co. v. City of Alhambra,*
   CV-11-253-PA (2011).............................................................. 16

*S. Cal. Gas Co. v. City of Santa Ana,*
   336 F.3d 885 (9th Cir. 2003)...................................................passim

*S. Cal. Gas Co. v. City of Vernon,*
   41 Cal. App. 4th 209 (1995)..................................................... 9, 19

*S. Cal. Gas v. City of Alhambra,*
   CV-10-8635-PA (2011)........................................................... 16, 17

*United Mine Workers v. Gibbs,*
   383 U.S. 715 (1966) .............................................................. 20

*United States v. Winstar Corp.,*
   518 U.S. 839 (1996) .............................................................. 13

*Univ. of Hawai'i Prof'l Assembly v. Cayetano,*
   183 F.3d 1096 (9th Cir. 1999)................................................... 10, 11

*Younger v. Harris,*
   401 U.S. 37 (1971) ............................................................... 22

**STATUTES**

28 U.S.C. § 1367.....................................................................3

28 U.S.C. § 1367(c)(1) ........................................................... 18, 19

28 U.S.C. § 1367(c)(2) ........................................................... 19, 20, 21

28 U.S.C. § 1367(c)(3) ............................................................. 18

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- iii -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

## TABLE OF AUTHORITIES
(continued)

Page

Pub. Util. Code § 2902 ........................................................................ 9, 14

Pub. Util. Code § 6202 ............................................................................... 6

Pub. Util. Code § 6294 ..................................................... 8, 14, 15, 17

## RULES

Rule 12(b)(6).......................................................................... 19, 21, 22

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- iv -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

## I.    INTRODUCTION

Southern California Edison Company (the "Utility") has failed to satisfy the threshold requirement for asserting an impairment of contract claim: That "there was a 'contractual agreement regarding the specific . . . terms allegedly'" impaired. *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).  If no term exists, the impairment claim fails. *Id.*  ("It is at this initial phase of the analysis that RUI's claim . . . fails.")  Issues of substantiality, reasonableness, and necessity do not come into play if this showing cannot be made.  The Utility does not deny this is required.  It argues that Ordinance No. 1622 (the "Ordinance") "flies in the face of the plain language of the Franchise, the parties' uniform past practice and expectations, and the agreement of the parties' reflected in a 2014 Memorandum of Agreement ('MOA')."  (Opp'n at 1:25-28.)  Beyond the rhetoric, the Utility fails to identify a contractual agreement regarding a specific term allegedly impaired.  It argues there is an impairment of contract in three ways, and none has merit.

First, the Utility asserts that the language "in, along, across, upon and under" in franchise section 2 is the impaired term.  (Opp'n at 11:19-22.)  The Utility in effect argues this language grants the Utility the right to construct, install, and maintain electric equipment above ground as opposed to underground without the City of Laguna Beach's (the "City") "interference," for the indeterminate future.  (*Id.* at 3:12; 11-13.)  Section 2 does not say that.  The section grants the Utility an electricity franchise within a geographic area.  It states the subject of the franchise and grants a franchise to the Utility as opposed to another entity.  The section does not state the Utility has the right to construct and maintain electric equipment above ground as opposed to underground without the City's "interference."

The Utility also argues that it has the right to construct and maintain equipment above ground as opposed to underground without the City's "interference" because of a "past practice" of "nearly <u>90</u> years."  (*Id.* at 13:2-4; 1:2

1   (emphasis in original).)  This argument also fails.  To the extent implied terms have

2   ever been found to form the basis of an impairment claim, that has only been the

3   case where the term is closely connected to an express term, and terms will not be

4   implied that are contrary to a municipality's police power.  Here, the term the

5   Utility seeks to imply is not closely connected to an express term, and, if the City

6   had given this right to the Utility, it would have surrendered its police power.

7        The Utility's second instance of supposed impairment is the argument that

8   the Ordinance "thwarts" its "performance" because it imposes "burdensome,"

9   "cumbersome," and "time-consuming" "procedures" and "hurdles."  (*Id.* at 14:8-

10  12.)  The Utility again fails to identify a term that has been impaired.  There is

11  nothing in the franchise that says the City will not impose anything the Utility

12  declares "burdensome," "cumbersome," or "time-consuming" or that prohibits the

13  City from including "procedures" that the Utility calls "hurdles."  (*Id.*)  As for an

14  implied term, the term to be implied would not be closely connected to an express

15  term, and if the City had given that right, it would be surrendering its police power.

16       Third, the Utility asserts that the franchise has been impaired because the

17  City's actions supposedly conflict with the State's authority, and the Utility's

18  expectations that the City would follow the law have been defeated.  (*Id.* at 16:12-

19  21.)  This argument fails as well.  The Utility conflates its *preemption* claim with its

20  *Contract Clause* claim.  No express term has been impaired, and, as an implied

21  term, it is not closely connected to any term.  There is no precedent for a Contract

22  Clause claim on this basis and it would open the floodgates for entry into federal

23  court if a claim could be stated on this ground.  If the Utility wants to pursue a

24  preemption claim – a claim that is denied – it can do so, but not by disguising it as a

25  Contract Clause claim.

26       The Utility refers in passing to other instances of impairment, such as a cost

27  increase and the MOA.  (*See, e.g., id.* at 14:20-22; 12:10-12.)  The Court in *RUI*

28  *One Corp. v. City of Berkeley*, 371 F.3d 1137, 1151 ("*RUI*"), rejected a similar

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 2 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

1   Contract Clause claim based on a cost increase.  The Utility never explains how the

2   MOA relates to its Contract Clause claim and there is no connection.

3        Furthermore, the Utility does not contest that, if the Court grants the City's

4   Motion to Dismiss the Contract Clause claims, it would be appropriate to decline to

5   exercise supplemental jurisdiction over, and thus dismiss, the remaining state law

6   claims pursuant to 28 U.S.C. section 1367.  As discussed below, the Court may

7   decline to exercise supplemental jurisdiction over the entire action.

8        The Utility concedes that the first and second requirements needed for the

9   Court to exercise *Pullman* abstention—a sensitive issue of social policy and a state

10  law determination would end the dispute—are present.  If the Court denies the

11  City's Motion, it will have to determine unresolved issues of state law, and

12  therefore the Court should abstain under the doctrine articulated in *R.R. Comm'n of*

13  *Texas v. Pullman Co.*, 312 U.S. 496 (1941).

14       In its Opposition, the Utility emphasizes the 90 years the franchise has been

15  in place.  (Opp'n at 1:2; 13:2.)  The Utility's attempt to manufacture an impairment

16  of contract claim shows that over these 90 years the Utility has forgotten the

17  purpose of a franchise, the Utility's role, and the City's powers.  The primary

18  purpose of a franchise is to benefit the public, not the Utility.  (Mot. at 9:10-11.)

19  The City has the police power to protect public safety.  (Mot. at 10:10-21.)  It is not

20  "interference" when the City exercises that power.  The Utility asserts in a footnote

21  it does not agree that above ground facilities have a detrimental effect on safety, but

22  impliedly acknowledges the problem when it indifferently describes the risk that a

23  "downed electric line may cause a fire" or "an out of control car may hit a power

24  pole" as "nothing new."  (Opp'n at 4, n.1; 21:12-13.)  The Utility's position reflects

25  the concern created when the performance of vital public services are delegated to

26  private entities, and why extraordinary precautions by the City must be taken to

27  protect the public welfare.  *Copt-Air v. City of San Diego*, 15 Cal. App. 3d 984,

28  988-89 (1971).  The City has the power to require the Utility to place future

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

1   equipment underground to protect public safety.  The franchise does not say

2   otherwise and confirms that power.  This Motion should be granted.

3   **II.    LEGAL STANDARD**

4           The Utility tries to defeat this Motion by asserting several pages of

5   background that it argues must be accepted as true for purposes of this Motion.

6   (Opp'n at 2-7.)  Although the Court must accept all factual allegations pleaded in

7   the complaint as true, it need not accept as true legal conclusions cast in the form of

8   factual allegations or unreasonable inferences.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

9   (2009); *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007); *Moss v. United States*

10  *Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).  For example, the Utility asserts

11  that "[t]he CPUC has declared that the matter of conversion from overhead to

12  underground electric facilities is 'inherently a matter of statewide concern' . . . . "

13  (Opp'n at 5:2-3.)  This is a legal argument, which need not be accepted.[1]

14          Moreover, the allegations do not compel the conclusion that there is an

15  impairment.  The issue in this Motion is whether there is an impairment of any

16  term.  For this analysis, the Court needs only to review the terms of the franchise.

17  Nothing prevents a court from adjudicating this issue at the pleadings stage.  *See*

18  Order Granting City of Huntington Beach's Mot. for J. on the Pleadings, *NextG*

19  *Networks of Cal. v. City of Huntington Beach*, No. 8:07-cv-01471 (C.D. Cal Feb.

20  23, 2009), ECF No. 72 (order granting a motion for judgment on the pleadings

21  finding that an undergrounding ordinance did not impair a state franchise).

22

23

24

25

26

27

28

---

[1] The City reserves its right to contest factual allegations, including the details of
the operational aspects of the Ordinance, which are not correctly described.

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 4 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

## III. ARGUMENT

### A. The Utility's Impairment Of Contract Claims Should Be Dismissed.

#### 1. The Utility Does Not Contest That Government Franchises Are Special Rights Granted For The Benefit Of The Public.

The nature of a franchise provides the framework for consideration of whether there has been an impairment of the franchise.  The Utility does not dispute these unique characteristics of a franchise that bear on the issue:

- A franchise is a special privilege to perform a public duty that is conferred by government;
- The primary objective of a franchise is to benefit the public;
- The rights of the utility pursuant to a franchise are secondary;
- Franchises involve services that government is to furnish, and concern matters of vital interest;
- When these services are delegated to private entities, extraordinary precautions are to be taken to protect the public interest;
- Franchise terms are dictated by the Legislature;
- Franchises are created by enactment of an ordinance;
- Franchises are construed in favor of the public interest;
- Franchises are strictly construed against utilities.

(Mot. at 9:8-28; 10:1-9.)  All of this is ignored by the Utility.  And all of these characteristics are critical to the manner in which the supposed impairment of the franchise must be viewed, as discussed below.

#### 2. The Utility Cannot Show The Impairment Of Any Term.

The Utility argues there is an impairment for three reasons: 1) the Ordinance impairs a supposed right to install equipment above the ground as opposed to below the ground (Opp'n at 11:19-22); 2) the  Ordinance imposes so-called procedural requirements that are "burdensome," "time-consuming," and "cumbersome" (*id.* at

14:8-12); and 3) the Ordinance conflicts with the authority of the State, *i.e.,* it is "preempted," which defeats the "expectations" of the Utility (*id.* at 16:12-21). None is a legitimate basis to assert an impairment of contract claim.

### a. The Franchise Does Not Give The Utility The Right To Install And Maintain Equipment Above Ground Or Underground Without The City's "Interference."

The Utility's first argument, that it has the right to place its electric equipment above the ground as opposed to below the ground without the City's "interference," is based on two arguments: 1) an express term has been impaired; and 2) an implied term created through course of dealing has been impaired. Neither has merit.

### (i) No Express Term Has Been Impaired.

The Utility asserts first that the language "in, along, across, upon and under the public streets" grants the Utility the right to construct, install and maintain its electric facilities above ground as opposed to underground without the City's interference. (Opp'n at 11:19-22.) The Utility has little analysis or discussion on this subject. It states it is "ludicrous for the City to contend" that this language does not give the Utility the right to place structures above rather than below the streets, and "[i]t is hard to believe that the City seriously contends that [the Utility] should install poles and towers underground." (*Id.* at 11:25-26.)

The phrase cited by the Utility does not grant the Utility the right to install and maintain electric equipment above ground as opposed to below the ground such that an undergrounding requirement is impermissible. The cited language simply grants an electricity franchise to the Utility. It describes the subject matter of the franchise and the territory where the franchise exists, and states that the franchise is being given to one utility and not another. The language is generic, standard language, lifted from the Franchise Act. Cal. Pub. Util. Code ("PUC") § 6202. It is broad language covering every type of utility franchise, including electricity, oil, gas, and water. It does not state that the City may not require undergrounding. The

1   phrase does not state that the Utility may install equipment above the ground as

2   opposed to below the ground or that the Utility has the unilateral power to decide

3   whether to construct or maintain equipment either above or below ground.  The

4   phrase does not state that the Utility may construct and operate poles and facilities

5   wherever it chooses, any more than an oil or gas franchisee would have the

6   unfettered right to place an oil pipeline above ground in the middle of a city street.

7   The Utility cites not a single case that holds or suggests that phrases such as "along,

8   across and upon" the streets grant a utility a contractual right to construct and use

9   electrical equipment above the ground as opposed to underground.

10          This term does not grant the right asserted by the Utility.  Comparing the

11   language side by side shows this.

| The franchise language states: | The Utility contends that it states: |
|---|---|
| *The franchise to construct and use for transmitting and distributing electricity to the public for any and all purposes, poles, wires, conduits and appurtenances,  including communication circuits necessary or proper therefor in, along, across, upon and under the public streets, ways, alleys and places within the City of Laguna Beach, is hereby granted to Southern California Edison Company, upon the terms and conditions set forth in the Franchise Act of 1937.*<br>(Compl., Ex. 1, § 2.) | *SCE has the right to construct, install and maintain its electric facilities above ground as opposed to underground without the City's interference.*<br>(Opp'n at 1:23-28; 14:2-4.) |

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 7 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

1    In addition, the Utility's impairment argument is contrary to PUC section

2  6294.  That section states that the Utility shall "construct, install, and maintain all

3  pipes, conduits, poles, wires, and appurtenances in accordance and in conformity

4  with all of the ordinances and rules adopted by the legislative body of the

5  municipality in the exercise of its police powers and not in conflict with the

6  paramount authority of the state."  Here, the City has enacted an Ordinance

7  requiring the Utility to construct, install, and maintain future electrical equipment

8  underground in the exercise of the City's police powers.

9    The Utility never comes to grips with this section.  The Utility responds in

10  two unsuccessful ways.  First, the Utility asserts that the Court in *S. Cal. Gas Co. v.*

11  *City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) ("*Santa Ana*"), did not accept an

12  argument that a broad reservation of rights provision, stating that the utility would

13  be subject to all future ordinances, could be read as an agreement by the utility that

14  it would comply with all future ordinances without complaining its franchise had

15  been impaired.  (Opp'n at 15:5-16:2).  This misconstrues the City's argument.  The

16  City relies on PUC section 6294 because of the substantive requirement it imposes

17  on the Utility: that it shall construct, install, and maintain all pipes, conduits, poles,

18  wires, and appurtenances in accordance and in conformity with City ordinances

19  enacted in the exercise of its police powers, such as this specific Ordinance.  This

20  section eviscerates the Utility's argument that it has the unilateral right to construct,

21  install and maintain its electric facilities above ground as opposed to underground

22  without the City's "interference."

23    The Utility also focuses on the last portion of section 6294 – "not in conflict

24  with the paramount authority of the state" – rather than the rest of the section.

25  (Opp'n at 2:8-10; 16:15-17.)  The Utility argues the franchise has been impaired

26  because the City has exceeded its authority and thus has defeated its "expectations."

27  (*Id.* at 16:17-20:13.)  The fact that this does not constitute a *bona fide* impairment

28  of contract argument is discussed *infra* at III.A.2.c.  But the Utility has no answer

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 8 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

1    for how this language undercuts its contention that the Utility has the franchise

2    right to construct, install and maintain its electric equipment above ground as

3    opposed to underground without the City's interference.

4         Likewise, the Utility's impairment argument is eviscerated by PUC section

5    2902.  Section 2902 states that a City cannot surrender its powers to supervise and

6    regulate in matters of safety the location of poles, wires, and conduits on, under, or

7    over the streets.  PUC § 2902.  This directly contradicts the Utility's argument that

8    it has the right to construct, install, and maintain electrical equipment above ground

9    as opposed to underground without the City's interference.  The Utility never

10   quotes section 2902.  Its only response is that section 2902 regulates "location" and

11   that undergrounding involves "design" and "installation."  (Opp'n at 19:10-14.)

12   The Utility simply asserts this conclusion without any actual support.  The Utility

13   cites *S. Cal. Gas Co. v. City of Vernon*, 41 Cal. App. 4th 209 (1995).  But that was a

14   writ case addressing whether the city or the CPUC had jurisdiction over

15   determining how deep gas pipes should be placed.  *Id.*  The Ordinance does not

16   address the design of underground equipment.  The Ordinance does not dictate the

17   depth that underground equipment would be placed.  Design is left to the Utility.

18   The Utility's attempt to parse section 2902 fails.

19        The City exercised its police powers to regulate matters of safety – the

20   location of electrical equipment by requiring undergrounding of new or

21   replacement facilities.  Despite the Utility's contention that there is "nothing new"

22   about car accidents and wildfires, the City exercised its police power to keep its

23   citizens safe, which it has the power to do.

24                    (ii)    **The Utility Does Not Have The Unilateral Right
                              To Decide Whether To Underground Based On
25                            "Course Of Dealing."**

26        The Utility next makes the attenuated argument that it has the right to place

27   the facilities above ground as opposed to below ground without City "interference"

28   because it has placed some equipment above ground for 90 years, in what it calls

1   "contractual expectations" based on "course of dealing." (Opp'n at 12:13-14.)

2   This "expectation" that the City would never require undergrounding rings hollow

3   because the Utility already maintains substantial equipment underground. (Compl.

4   at ¶ 34; Opp'n at 4:8-9.) And the Ordinance only requires new or replacement

5   equipment be placed underground in the future, not an undergrounding of all

6   existing equipment, and contains exceptions for small projects and an exemption

7   process. (*See generally* Compl., Ex. 4.) The Utility's effort to create this supposed

8   right based on an alleged "course of dealing" whereby it installed "most" of its

9   facilities above the ground in the past makes no sense. (Opp'n at 4:8-9.)

10   The cases the Utility cites on the subject, *Santa Ana* and *Univ. of Hawai'i*

11   *Prof'l Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir. 1999) ("*Cayetano*"), are

12   distinguishable. First, *Cayetano* did not consider a franchise. The subject was a

13   collective bargaining agreement. *Cayetano*, 183 F.3d at 1099. The Court merely

14   held in that context that payment for 25 years on a certain schedule had created a

15   contractual expectation based on that course of conduct. *Id.* at 1102. The Court

16   emphasized that past practice consideration applied in the collective bargaining

17   context. *Id.* As noted in *RUI*, the implied term was clearly part of the bargained-

18   for agreement and there was a course of dealing under Hawaii contract law. 371

19   F.3d at 1149.

20   As for *Santa Ana*, the Court merely found that, where the prohibition on the

21   imposition of a fee was a fair reading of the terms of the franchise, course of

22   dealing confirmed the reading. In that case, the franchise, at section 10, required

23   the gas company, at its own expense, to repair damage to the street under the

24   direction of Santa Ana's city engineer. *Santa Ana*, 336 F.3d at 888. The Court

25   considered the gas company's past practice to understand the role of that section of

26   the franchise. Here, the franchise does not support the impairment argument.[2]

27

28

---

[2]The Utility also cites *Santa Ana* for the proposition that an impairment is *substantial* if it "defeats the expectations of the parties." (*See, e.g.,* Opp'n at 13:22-

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

The Utility cites *RUI* but does not discuss the case.  *RUI* demonstrates that *Santa Ana* and *Cayetano* are readily distinguishable, and also that impairment based on an implied term and course of conduct is not available here.  The term the Utility seeks to imply is not closely connected to any written term and if recognized would be contrary to the City's police powers.

In that case, RUI argued that a living wage ordinance impaired a lease between the City and the lessee because it affected the wages the lessee had to pay its employees and thus imposed an economic burden.  *RUI*, 371 F.3d at 1148-51.  The Court first turned to the lease, and concluded the ordinance did not impair any specific provision.  *Id.* at 1148.  The lessee next argued that the ordinance impaired implied terms.  *Id.* at 1148-49.  The Court rejected the argument.  The Court first cited the contract law principle that, because the lease was integrated, there could be no implied terms.  *Id.* at 1148.  The Court acknowledged that terms could be implied if they there were "non-essential" and closely connected to express provisions.  *Id.*  The Court also noted that, while implied terms had been the basis of a Contract Clause claim in limited instances, that was only the case where the contracting parties' manifest assent was present and also the term was so central to the bargained for exchange that it must be deemed to be a term of the contract.  *Id.* at 1148-49.

The Court went on to write that other decisions had found statutes or ordinances to impair implied terms, but only "when such terms were clearly part of the bargained-for agreement."  *Id.* at 1149.  As noted, the Court explained that, in *Cayetano*, a 25-year payment practice constituted a course of dealing under *Hawaii* contract law because it was clearly part of the bargained-for agreement despite the fact that the term was not expressly stated.  *Id.*

25).  As in *RUI* and *Romein*, a Court need not reach the substantiality analysis if the Utility cannot identify an impairment of a contractual term.  The Utility addresses the wrong element of the analysis by alleging its expectations in this context.

1   As for *Santa Ana*, using the language partially quoted by the Utility, the

2   Court stated:

3   Although the 1938 contract did not specifically forbid the city from

4   imposing such fees, we noted that a fair reading of its terms, coupled

5   with years of past practice, conferred on the utility a right to excavate

6   below city streets and repair any damage it creates in the process – ***and***

7   ***that the city's bald attempt to increase its revenue by imposing an***

8   ***additional 'direct, immediate and measurable [cost, which] affects a***

9   ***central provision of the franchise" was therefore unconstitutional.***

10   *Id.* (emphasis added).  The Utility omits the emphasized clause that shows the

11   course of conduct confirmed the franchise language.  (Opp'n at 12:26-28; 13:1.)

12   No similar franchise language exists here.

13   After discussing the two cases, the Court in *RUI* held that there was no

14   impairment based on the implied term asserted by RUI – that the city had agreed it

15   would not enact an ordinance imposing an economic burden.  *RUI*, 371 F.3d at

16   1149-50.  The Court stated that such a term would be "void as against public

17   policy" because it would constitute the bargaining away of the city's police powers.

18   *Id.* at 1149.  The Court also held that the lease, stating that RUI would comply with

19   all applicable laws, ordinances, and regulations, required RUI to comply with laws

20   enacted in the future.  *Id.* at 1150.

21   *RUI* has important application to this case.  It confirms that the threshold

22   issue is whether there is an express contract term that has been impaired.  The Court

23   in *RUI* found that an implied term through course of conduct must be directly tied

24   to an express term and must be non-essential.  *Id.* at 1148.  Here, the term the

25   Utility seeks to imply through course of conduct is not directly tied to any express

26   term and cannot be described as non-essential.  Unlike the facts in *Santa Ana*, there

27   is no "bald attempt" by the City to increase its revenues by imposing a direct cost

28   that affects a central provision of the franchise.  To the extent the Utility is trying to

impose an implied term that the City would not impose an economic burden on the
Utility, this would be void as against public policy. *RUI* acknowledges that a city's
police power is a limitation on the imposition of an implied term. *Id.* at 1149.
Here, the City acted in the exercise of its police power. The Court in *RUI* enforced
a provision that the lessee shall comply with all applicable ordinances and did not
disregard it. *Id.* at 1150. *RUI* demonstrates that an impairment claim based on an
implied term is unavailable here.

Furthermore, implied terms that purport to create government contractual
obligations are highly disfavored. *Maui Land & Pineapple Co. v. Cty. of Maui*, No.
CV 08-00465 SOM/LEK, 2010 WL 1372416, at *5 (D. Haw. Mar. 31, 2010);
*United States v. Winstar Corp.*, 518 U.S. 839, 874 (1996).

### b. There Is No Impairment Because Of What The Utility Calls "Cumbersome And Time-Consuming Hurdles."

The Utility next argues the Ordinance "thwarts" franchise performance by
creating "cumbersome," "burdensome," and "time-consuming" "hurdles" and
"procedures." (Opp'n at 14:8-9.) This argument vividly displays that the Utility
has forgotten or is ignoring the purpose of a franchise, the Utility's role, and the
City's police power to protect public safety. A franchise is not designed for the
convenience of the Utility so that it may proceed without being bothered by what it
considers to be "cumbersome" procedures. (*Id.*) A franchise is a special privilege
designed primarily to benefit the public, not the Utility, so vital public services may
be provided to the public. Even if the Utility considers the safety concerns that
caused the City to take action as "nothing new," public safety is paramount.

In any event, an impairment of contract claim fails as a matter of law. The
Utility has failed to identify any franchise term that has been impaired. There is no
express term that grants any right to the Utility on this subject. The franchise does
not say the City will impose no requirements on the Utility that the Utility declares
to be "cumbersome" or "time-consuming." (*Id.*) The franchise does not state that

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

the City will not do anything that "burdens" the Utility.  The franchise does not grant the Utility the power to develop all procedures.

Nor can the Utility rely upon an "implied term" based on "course of dealing" on this subject.  There is no express term to which this vague right can be seen as closely connected, and the term is not non-essential.  To the extent the Utility is trying to imply this vague term, an agreement that the City would not burden the Utility in any way, that it would impose no procedures, or that it would do nothing that the Utility might consider cumbersome or time-consuming would be void as against public policy as the agreement would constitute the City surrendering its police powers.  *RUI*, 371 F.3d at 1149.  As noted, PUC section 6294 requires the Utility to construct, install, and maintain all conduits, poles, and wires in accordance and in conformity with all of the ordinances and rules adopted by the legislative body of the municipality in the exercise of its police powers.  PUC section 2902 prohibits the City from surrendering its police powers.  The Utility's position is directly contrary to these statutes and the City's police power.

The MOA, which is briefly referenced by the Utility for uncertain reasons, notes that the Utility must "communicate with, and obtain the input of, the City regarding land use matters and obtain any non-discretionary local permits required for the construction and operation of such projects." (Compl., Ex. 3, § 5.)  The Utility already must follow City established procedures.  This directly contradicts the Utility's contention that it has the unilateral discretion to place its equipment above or below ground as it sees fit based on the franchise.

### c.   The Utility's Preemption Argument Is Not A Basis For A Contract Clause Claim.

Buried in the Utility's argument about the scope of the City's police power is its third impairment of contract argument.  The Utility's attenuated argument is: 1) PUC section 6294 "is limited to ordinances 'not in conflict with the paramount authority of the State,'" 2) the Utility "expected" that the City would not exceed the

1   paramount authority of the State, 3) the City exceeded the paramount authority of

2   the State by entering into an area that allegedly has been preempted, and 4) the

3   Utility's "expectations" were therefore defeated. (*Id*. at 16:12-21.)  The Utility

4   argues at length that the Ordinance is preempted. (*Id*. at 16-20.)

5       This analysis does not establish an impairment claim.  If the Utility wishes to

6   pursue its preemption claim, it is free to do so and the City will defend it.  But no

7   impairment of contract claim can be stated on this basis.  To begin with, the Utility

8   cannot argue that any franchise term has been impaired.  The Utility does not cite

9   the franchise.  The Utility relies on PUC section 6294, which imposes no duty on

10  the City and instead imposes a requirement on the Utility.

11      As for the argument about the Utility's "expectation," the Utility is trying to

12  imply a term.  The effort to do so fails.  The Utility has not cited any term to which

13  this supposed term is closely tied.  The Utility cites no case recognizing that acting

14  "in excess of authority" would constitute a ground for an impairment of contract

15  claim.  The Utility only cites *Santa Ana*, which has been discussed at length and

16  does not address this issue at all.

17      If preemption or an allegation of illegality were to be recognized as a new

18  basis of a Contract Clause claim, it would mean a limitless expansion of

19  impairment of contract claims.  Any time one party could assert the other party has

20  acted in a way that is "unlawful," that allegation would qualify for a substantive

21  claim on that ground *plus* a federal impairment of contract claim.

22      This is an obvious attempt by the Utility to throw a lifeline to its Contract

23  Clause claim by conflating it with its preemption claim.  If the Utility wants to

24  pursue preemption, it is free to do so (though it should be in state court) and the

25  City will defend that claim.  But this is not a *bona fide* claim of an impairment of an

26  implied term.

27

28

- 15 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

### d.      There Is No Impairment Of Contract Because Of An Alleged Increase In The Utility's Costs.

The Utility has all but abandoned its argument about impairment based on an alleged increase in costs.  The Utility only makes passing references to the subject. (*See, e.g.,* Opp'n at 14:20-22.)  Presumably, the Utility's argument is equivocal because it has admitted that the costs will be absorbed by customers (Compl. at ¶¶ 43, 45; Opp'n at 7:4-11) and the Utility will recoup any undergrounding expenses in the rate cases conducted every three years by the CPUC.  Furthermore, as the Court concluded in *RUI*, an agreement that a municipality would not adopt any ordinances that affected a utility's costs would be void as against public policy. *RUI*, 371 F.3d at 1149, 1151.

### e.      The MOA Does Not Establish An Impairment Claim.

The Utility refers to an MOA, but never makes clear its point.  (Opp'n at 5:28-6:1-5; 12:10-12.)  The MOA does not control the subject of undergrounding. In fact, it expressly acknowledges the "City's desire and efforts to underground existing overhead utility facilities."  (Compl., Ex. 3, ¶ 4.)  Further, the MOA shows the Utility's position that the City has no role and is "interfering" is erroneous.  If the Utility has unfettered control over all aspects of the procedures, and the City has no role or authority, there would be no reason for the MOA to exist.  The Utility's unclear reference to the MOA is not the basis of any argument that there has been an impairment of the franchise.

### 3.      The *Santa Ana* And *Alhambra* Cases Are Distinguishable.

The Utility relies most heavily on *Santa Ana* and to a lesser extent on the district court grant of summary judgment in *S. Cal. Gas v. City of Alhambra,* CV-10-8635-PA, and *S. Cal. Edison Co. v. City of Alhambra*, CV-11-253-PA (2011) (collectively, "*Alhambra*").  The Utility describes *Santa Ana* as "particularly instructive."  (Opp'n at 9:7.)  The City has explained why those cases are distinguishable.  For example, in *Santa Ana*, the city imposed a fee for something

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 16 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

the utility already had the franchise right to do for free.  The franchise specified the fee to be paid by the utility and the city then imposed another fee.  *Santa Ana*, 336 F.3d at 891.  Moreover, the franchise expressly specified how the utility was to go about making repairs, and the ordinance directly changed that method.  *Id.* at 892-93.  In *Alhambra*, the  franchise directly specified the fee to be paid by the utility, and the ordinance imposed an additional fee.  By contrast, the Ordinance in this case does not require the Utility to pay for something it had the right to do without charge, does not impose a fee in excess of the amount specified in the franchise, does not alter a method of repair specified in the franchise, and does not impair any other provision of the franchise.  *Santa Ana* and *Alhambra* only establish that different ordinances imposing different requirements may impair other franchises under different circumstances.

The Utility also relies on *Santa Ana* to argue that the City cannot rely on language from PUC section 6294 stating that the Utility will be subject to future ordinances enacted by the City.  (Opp'n at 15:5-18.)  As noted earlier, this attempt to attempt to avoid section 6294 fails.  Moreover, in *RUI*, 371 F.3d at 1150, the Court recognized that a reservation of rights mandating that RUI would "comply with all applicable laws, ordinance[s], and regulations of the City [of Berkeley]" meant that RUI would have to comply with existing as well as future laws.

### 4.   Other Arguments Made By The Utility Are Irrelevant.

Much of the Utility's Opposition covers subjects that are irrelevant to this Motion.  The Utility's multi-page argument about preemption has no bearing on any issue in this Motion.  The same is true of other arguments made by the Utility.[3]

For example, the Utility argues at length that the City's Motion should be denied because the City has not demonstrated the Ordinance is both reasonable and

---

[3] The City reserves its right to contest the Utility's misstatements regarding the facts and law surrounding preemption. Notably, the Utility cites no case law that establishes that the CPUC preempted the field to the exclusion of the Ordinance. The City will address these arguments at the appropriate time and forum.

necessary.  (Opp'n at 20:14-28; 21: 1-22.)  The Utility has not addressed "reasonableness" or "necessity" because these subjects need not be addressed for the City to prevail on this Motion.  The issue raised by this Motion is whether the Utility has made the threshold showing that a term has been impaired.  Because the Utility has failed to make that showing, there is no need to address whether the Ordinance is "reasonable" or "necessary."

**5.      The Court Should Decline To Exercise Supplemental Jurisdiction.**

The Utility does not contest that if the Court grants the City's Motion to Dismiss the Contract Clause claims, it would be appropriate to decline to exercise supplemental jurisdiction over the remaining state law claims pursuant to section 1367(c)(3).  The City will only address the issue of supplemental jurisdiction in the event that its Motion to Dismiss the Contract Clause claims is denied.

Under section 1367(c)(1), a court may decline supplemental jurisdiction over claims that present novel and complex issues of state law.  Other courts have done exactly that substantially similar circumstances.  *See Qwest Commc'ns Corp. v. City of Berkeley*, 146 F. Supp. 2d 1081, 1101-02 (N.D. Cal. 2001) (declining supplemental jurisdiction over state law claims under section 1367(c)(1) where utility challenged legality of city ordinance); *Pac. Bell Tel. Co. v. City of Walnut Creek*, 428 F. Supp. 2d 1037, 1048-49 (N.D. Cal. 2006) (declining supplemental jurisdiction under section 1367(c)(1) where utility challenged city's imposition of franchise condition).

Here, the Utility's own Opposition brief demonstrates that, if the City's Motion to Dismiss is denied, the Court will need to resolve novel and complex issues, such as the Utility's state law impairment claim.  The Utility devotes almost 13 pages of its Opposition to just one element of impairment (whether a substantial impairment exists), without citing a single case that addresses whether an undergrounding requirement in and of itself impairs purported contractual right.

(Opp'n at 8-20.)  The complexity of the Utility's own impairment argument shows why the Court should decline supplemental jurisdiction.

The Utility tethers the issue of impairment to the separate issue of whether the Ordinance is preempted by state law.  (*Id.* at 16-18.)  Even assuming, *arguendo*, that an allegation of preemption can be bootstrapped into a claim of impairment of contract, the Utility cites no federal or state case holding that a mere requirement of undergrounding is preempted by state law.  The Utility cites *S. Cal. Gas Co. v. City of Vernon*, 41 Cal. App. 4th at 217, and *City of Anaheim v. Pac. Bell Tel. Co.*, 119 Cal. App. 4th 838 (2004), but those cases addressed whether a city could dictate the design of underground equipment and hold a utility responsible for costs, without addressing the basic issue here, which is whether a requirement of undergrounding is preempted by the CPUC.  The Utility's reliance on 40-year-old administrative opinions is likewise misplaced—only where there is actual case law on point can a complex issue like preemption be considered settled under state law.  *Cf. Cedar Shake and Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 621, 625 (9th Cir. 1993) (state law preemption question considered unresolved despite Attorney General opinion directly on point).

Accordingly, if the City's Rule 12(b)(6) Motion is denied, the Court should decline supplemental jurisdiction over the state law claims under section 1367(c)(1) and stay adjudication of the federal impairment claim.

The Court may also decline supplemental jurisdiction over the Utility's state law claims under section 1367(c)(2), because those claims predominate over the Utility's sole federal claim.  Both impairment and preemption are based on issues of state law that will require the interpretation of CPUC statutes and regulations and questions of state law preemption.  Under cases cited by the Utility, state law claims predominate under section 1367(c)(2) where, as here, state law *issues* predominate and the federal claim is only an "appendage."  *See Housing Rights Ctr., Inc. v. Moskowitz*, 2004 WL 3738293, *4 (C.D. Cal., Sept. 20, 2004) (citing

and quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726-27 (1966)); *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 789 (3d Cir. 1995) (same).  Here, the only putative federal "issue," impairment, is identical under both state and federal law and is dependent on the interpretation of state statutes and regulations. Retaining jurisdiction on the basis of the Utility's federal impairment claim would "allow[ ] a federal tail to wag what is in substance a state dog."  *Gibbs*, 383 U.S. at 727.[4]

The Utility argues that its state law claims do not predominate because all of its claims supposedly arise from a common nucleus of fact.  (Opp'n at 22:13-24.) But that argument conflates the question of whether there is basis for supplemental jurisdiction with the question of whether, assuming such a basis, a court may still decline jurisdiction.  A common nucleus of fact is a prerequisite for supplemental jurisdiction.  See *Brenek v. Town of Griswold*, 2010 WL 2293173, *3 (D. Conn. Jun. 3, 2010) (quoting *Gibbs*, 383 U.S. at 725) [cited by Utility].  The question under section 1367(c)(2) is not whether jurisdiction exists, but whether a court with jurisdiction should use its discretion to decline to exercise that jurisdiction.  Under the Utility's logic, a court could never decline supplemental jurisdiction over claims that share a common nucleus of fact.

The Utility also argues that the Court should retain supplemental jurisdiction because all of its claims are based on the same evidence.  (Opp'n at 22-26.)  To the contrary, evidence regarding impairment and preemption differs significantly.  To prove impairment, the Utility must prove that the City's undergrounding requirement constitutes a substantial impairment yet is neither reasonable nor necessary—none of which addresses whether the Ordinance is preempted in the

---

[4] In *West Mifflin*, one of the reasons the court cited for its conclusion that state law claims did not predominate was that the federal claims raised "distinct" issues. 45 F.3d at 790.  There are no "distinct" federal issues here.

- 20 -

DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR STAY

1  first instance by state law.[5]  The Court should decline to exercise supplemental

2  jurisdiction over the state law claims under section 1367(c)(2) and stay adjudication

3  of the federal impairment claim.

**B.    Alternatively, The Court Should Abstain And Stay Or Dismiss
The Action.**

6      The Utility does not contest that the first requirement for *Pullman*

7  abstention—a sensitive issue of social policy—is present.  Nor is there any dispute

8  that a state court determination that the Ordinance is preempted or constitutes

9  impairment under California law would end the dispute without any need for this

10  court to determine the sensitive issue.  Thus, the second requirement for *Pullman*

11  abstention is also uncontested.  The only question is whether resolution of the state

12  law issue is uncertain.

13      As discussed above, the Utility's own Opposition to the City's Rule 12(b)(6)

14  Motion demonstrates that, if the Court denies the City's Motion, it will have to

15  determine unresolved issues of state law.  Unless the Court grants the City's

16  Motion, these state law issues will qualify as uncertain for purposes of *Pullman*

17  abstention because the Court will have to interpret the meaning and effect of

18  statutes, regulations, and tariffs without the benefit of relevant state court case law.

19  *See Pac. Bell*, 428 F. Supp. 2d at 1047-49, 1051.  That the Court is competent to

20  make those determinations is not in question, but nor is that the test.  The policy

21  underlying *Pullman* abstention is that a state court should determine unresolved

22  issues of state law where doing so will relieve a federal court of the need to decide

23  sensitive issues with constitutional implications.

---

[5] Further, the Utility requests a jury trial, which, if available, would only pertain to its impairment claim.  (Preemption and declaratory relief are equitable claims.) Where federal and state law claims differ regarding entitlement to a jury, dismissal under section 1367(c)(2) is appropriate.  *See Detroit Mem'l Park Ass'n, Inc. v. City of Detroit Bd. of Zoning Appeals*, 105 F. Supp. 3d 769, 779 (E.D. Mich. 2015).

1       The cases cited by the Utility which found an inadequate showing of the third

2   *Pullman* factor are readily distinguishable.  In *Prime Healthcare Servs., Inc. v.*

3   *Harris*, 216 F. Supp. 3d 1096 (S.D. Cal. 2016), the defendant, as here, moved for

4   both dismissal under Rule 12(b)(6) and *Pullman* abstention, but the court granted

5   the 12(b)(6) motion, thereby implicitly finding that the underlying state law was not

6   uncertain.  In *Detroit Mem'l Park Ass'n, Inc.*, 105 F. Supp. 3d 769, and *Hancock v.*

7   *City of Richfield*, *Wash.*, 2009 WL 4110804 (W.D. Wash. Nov. 23, 2009), unlike

8   here, there was no companion motion under Rule 12(b)(6) to flesh out state court

9   issues, and no other showing of which state law issues were uncertain and why.

10  And in *Kelly v. Lopeman*, 680 F. Supp. 1101 (S.D. Ohio 1987), while the defendant

11  also moved to dismiss under Rule 12(b)(6), the motion was summarily denied

12  without analysis and, moreover, the court abstained under *Younger v. Harris*, 401

13  U.S. 37 (1971), thereby obviating any need to identify uncertain issues of state law.

14      All three elements of *Pullman* abstention are present.  Accordingly, if the

15  Court denies the City's Rule 12(b)(6) Motion, it should abstain under *Pullman*.

16

17

18

19

20

21

22

23

24

25

26

27

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

- 22 -

DEFENDANT'S REPLY MEMORANDUM IN
SUPPORT OF MOTION TO DISMISS OR STAY

IV.   **CONCLUSION**

The City respectfully requests that the Court dismiss or stay the federal Contract Clause claim and dismiss all of the state law claims.

Dated:  July 10, 2017          MANATT, PHELPS & PHILLIPS, LLP


*/s/ Ronald B. Turovsky*
Ronald B. Turovsky
*Attorneys for Defendant*
City of Laguna Beach


Dated:  July 10, 2017          RUTAN & TUCKER, LLP


*/s/ Philip D. Kohn*
Philip D. Kohn
*Attorneys for Defendant*
City of Laguna Beach

SIGNATURE ATTESTATION:

I hereby attest that all signatories listed above, on whose behalf this Motion is submitted, concur in the filing's content and have authorized the filing.

Dated:  July 10, 2017          MANATT, PHELPS & PHILLIPS, LLP


*/s/ Ronald B. Turovsky*
Ronald B. Turovsky
*Attorneys for Defendant*
CITY OF LAGUNA BEACH

318965223.9

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR STAY

# EXHIBIT A

1  JAMES POLISH (SBN 058034)
   jpolish@carlsmith.com
2  MARY R. CONKLIN (SBN 266173)
   mconklin@carlsmith.com
3  CARLSMITH BALL LLP
   515 South Flower Street, Suite 2900
4  Los Angeles, CA  90071-2225
   Telephone: 213.955.1200
5  Facsimile:  213.623.0032

6  PATRICIA A. CIRUCCI (SBN 210574)
   Patricia.Cirucci@sce.com
7  MARK A. ROTHENBERG (SBN 242213)
   Mark.A.Rothenberg@sce.com
8  SOUTHERN CALIFORNIA EDISON
   COMPANY
9  2244 Walnut Grove Avenue, Third Floor
   Rosemead, CA  91770
10 Telephone: 626.302.6704
   Facsimile:   626.302.6873

11
12 Attorneys for Plaintiff
   Southern California Edison Company

13                UNITED STATES DISTRICT COURT

14                     CENTRAL DISTRICT

15

16 SOUTHERN CALIFORNIA EDISON          CASE NO. 8:17-cv-00618
   COMPANY, a California Corporation,
17                                     COMPLAINT FOR PRELIMINARY
              Plaintiff,               AND PERMANENT INJUNCTIVE
18                                     RELIEF AND DECLARATORY
   v.                                  RELIEF FOR:
19
   CITY OF LAGUNA BEACH, a             (1) UNCONSTITUTIONAL
20 Municipal Corporation,              IMPAIRMENT OF CONTRACT IN
                                       VIOLATION OF THE CONTRACT
21            Defendant.               CLAUSES OF THE UNITED
                                       STATES AND CALIFORNIA
22                                     CONSTITUTIONS; AND

23                                     (2) PREEMPTION BY STATE LAW
                                       AND VIOLATION OF STATE LAW.
24
                                       **DEMAND FOR JURY TRIAL**
25

26

27

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

EXHIBIT A
PAGE 25

1    Plaintiff Southern California Edison Company ("SCE") alleges:

2    **<u>JURISDICTION AND VENUE</u>**

3    1.    This Court has jurisdiction over this action pursuant to: (a) 28 U.S.C.

4    § 1331 in that the action arises under the Contract Clause of the United States

5    Constitution (Article 1, Section 10, Clause 1), and SCE's right to relief depends on

6    resolution of substantial questions of federal law; (b) 28 U.S.C. § 1343(3) and (4) in

7    that this action seeks to redress a deprivation, under color of law, of a right,

8    privilege or immunity secured by the United States Constitution and seeks to

9    recover equitable and other relief under 42 U.S.C. § 1983, an Act of Congress

10   providing for the protection of civil rights; and (c) 28 U.S.C. § 1367 which gives

11   this Court supplemental jurisdiction over SCE's state claims.

12   2.    Venue is proper in the Central District of California pursuant to (a) 28

13   U.S.C. § 1391(b)(1) in that defendant City of Laguna Beach (the "City") resides

14   and does business in this District, including business related to the claims in this

15   Complaint; and (b) 28 U.S.C. § 1391(b)(2) in that the events giving rise to SCE's

16   claims occurred in this District and the property that is the subject of this action is

17   located in this District.

18   **<u>SUMMARY OF THIS ACTION</u>**

19   3.    SCE is a publicly regulated utility (classified under state law as a

20   "public utility") that provides electric service to customers in the City.  SCE

21   maintains portions of its electric facilities within the City's rights-of-way and on

22   City property pursuant to a City-approved franchise (the "Franchise").  The

23   Franchise grants SCE the right to construct and use poles, wires, and conduits

24   along, across, upon, and under the public streets and places in the City.  SCE's

25   overhead electrical system in the City consists primarily of poles, wires,

26   transformers, and related equipment.

27   4.    On March 28, 2017, over SCE's objections, the City enacted

28   Ordinance No. 1622 regarding the undergrounding of utilities.  With limited

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

3

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   exceptions, Section 1 of the ordinance purports to require the underground

2   installation by SCE of all new, replacement, relocated, or reconstructed poles,

3   overhead wires, and associated overhead structures in the City that SCE used to

4   supply electricity to its customers.  Section 1 of the ordinance will be referred to

5   herein as the "Undergrounding Ordinance."  As justification for the

6   Undergrounding Ordinance, the City has identified fires, road closures, power

7   outages, and vehicle collisions with utility poles on Laguna Canyon Road that the

8   City attributes to poles, overhead wires, and associated overhead structures.

9   Although SCE has the flexibility to relocate or harden its above-ground facilities to

10  address such concerns (where proven true), the Undergrounding Ordinance

11  mandates the specific design solution of undergrounding.  Compliance with the

12  Undergrounding Ordinance would add significant delay and expense to SCE's

13  construction, maintenance, and repair of its electric facilities in the City and would

14  likely create safety hazards and adversely affect service reliability.  The

15  Undergrounding Ordinance substantially impairs SCE's contractual rights under the

16  Franchise in violation of the Contract Clauses of the United States and California

17  Constitutions (First, Second, and Fourth Claims for Relief).

18      5.   The Undergrounding Ordinance is also preempted by state law (Third

19  and Fourth Claims for Relief) because it interferes with the exclusive jurisdiction of

20  the California Public Utilities Commission ("CPUC") to regulate the

21  undergrounding of SCE's facilities and the rates SCE charges for service.  The

22  California Constitution and the California Public Utilities Code designate the

23  CPUC as the entity responsible for such regulation because questions of when and

24  where undergrounding is warranted and who should bear the cost are matters of

25  statewide concern requiring uniformity in decision-making.

26      6.   The CPUC has exercised its jurisdiction over undergrounding.  For

27  example, pursuant to the CPUC's mandate, SCE adopted, and the CPUC approved,

28  SCE Tariff Rule 20 ("Rule 20"), which establishes the circumstances under which

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

4

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 27

1   SCE will replace existing overhead electric facilities with underground electric
2   facilities and who will bear the costs of the replacement.  SCE cannot comply both
3   with the Undergrounding Ordinance and the CPUC's decisions, orders, and tariffs
4   because they are fundamentally inconsistent.  There is currently pending before the
5   CPUC a proceeding in which the City has proposed that the CPUC adopt additional
6   regulations concerning undergrounding of overhead utility facilities to address
7   safety risks.  By enacting the Undergrounding Ordinance, the City seeks to
8   circumvent the CPUC's decision-making authority in that proceeding, Rule 20, and
9   the CPUC's exclusive jurisdiction over the design of utility facilities.

10       7.      By this action SCE seeks preliminary and final injunctive relief to
11   prevent the City from enforcing the unlawful Undergrounding Ordinance and
12   declaratory relief to confirm that the Undergrounding Ordinance is not enforceable
13   against SCE.  SCE also seeks to recover the attorneys' fees it has incurred to date,
14   and will continue to incur during the pendency of this action.  SCE is entitled to
15   recover its attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988(b) and
16   California Code of Civil Procedure § 1021.5.

17                                    **THE PARTIES**

18       8.      SCE is a California corporation duly organized and existing under the
19   laws of the State of California and has its principal place of business in this District.
20   SCE is an investor-owned public utility (as the term "public utility" is defined by
21   California Public Utilities Code § 216(a)) and is subject to regulation by the CPUC
22   (*id.* § 216(b)).  In this capacity SCE has a duty to serve its customers.  SCE has
23   approximately 5 million customer accounts through which it provides power to 15
24   million people and businesses in a 50,000-square-mile service area, encompassing
25   approximately 195 cities and counties in central, coastal, and southern California.
26   SCE's service territory includes a large portion of the City.  Another public utility,
27   San Diego Gas & Electric Company, serves the southern portion of the City.
28       9.      The City is a municipal corporation, organized under the laws of the

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

5

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   State of California, with the capacity to be sued and has its principal place of

2   business in this District.

### GENERAL ALLEGATIONS

#### The Franchise

5   10.   The Franchise Act of 1937 (the "Franchise Act"), codified in

6   California Public Utilities Code § 6201, *et seq.*, gives municipalities the right to

7   grant franchises, and establishes terms for franchises, to any person, firm, or

8   corporation "to use, or to construct and use, poles, wires, conduits, and

9   appurtenances for transmitting and distributing electricity for all purposes ... under,

10   ***along, across, and upon*** the public streets, ways, alleys, and places within the

11   municipality…."  California Public Utilities Code § 6202 (emphasis added).  Every

12   franchise granted pursuant to the Franchise Act has an indeterminate term except

13   when a different term is specified in the ordinance granting it.  *Id.* § 6264.  An

14   indeterminate term franchise remains in full force and effect until, with the consent

15   of the CPUC, it is voluntarily surrendered or abandoned by its possessor, it is

16   purchased by voluntary agreement, it is condemned or taken under the power of

17   eminent domain, or it is forfeited for noncompliance with its terms by its possessor.

18   *Id.*

19   11.   On or about April 14, 1948, the City adopted Ordinance No. 289

20   granting the Franchise to SCE for an indeterminate term.  The Franchise supersedes

21   a franchise the City granted to SCE in 1928 pursuant to Ordinance No. 59, which

22   authorized SCE to construct, operate, and maintain its electric systems in the City.

23   At the time it granted the current Franchise to SCE, the City was aware that SCE

24   had installed in the City poles and overhead electric facilities (such as wires and

25   transformers) to provide electric service to its customers, and regularly repaired,

26   maintained, and replaced those poles and overhead facilities and added new poles

27   and overhead facilities as needed.

28   12.   The current Franchise authorizes SCE to construct and use in the City

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

6

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 29

1  facilities for transmitting and distributing electricity pursuant to the terms and

2  conditions set forth in the Franchise Act.  Specifically, Section 2 of the Franchise

3  authorizes SCE "to construct and use for transmitting and distributing electricity to

4  the public for any and all purposes, poles, wires, conduits and appurtenances,

5  including communication circuits necessary or proper therefor in, ***along, across,***

6  ***upon*** and under the public streets, ways, alleys and places within the City of

7  Laguna Beach …, upon the terms and conditions set forth in the Franchise Act of

8  1937." (Emphasis added.) Section 1(e) of the Franchise defines the phrase

9  "construct and use" to mean "to lay, construct, erect, install, operate, maintain, use,

10  repair or replace." Section 1(d) of the Franchise defines the phrase "poles, wires,

11  conduits and appurtenances" to include, among other things, poles, wires,

12  conductors, cables, transformers, appurtenances and "***any other property located or***

13  ***to be located in, upon, along, across, under or over the streets of the City***, and use

14  [sic] or useful in the transmitting and/or distributing of electricity…." (Emphasis

15  added.)

16       13.    Public Utilities Code § 6294, a part of the Franchise Act, provides:

17         The grantee of a franchise under this chapter shall

18         construct, install, and maintain all pipes, conduits, poles,

19         wires, and appurtenances in accordance and in conformity

20         with all of the ordinances and rules adopted by the

21         legislative body of the municipality in the exercise of its

22         police powers ***and not in conflict with the paramount***

23         ***authority of the State….*** (Emphasis added.)

24       14.    In consideration for the rights the City granted to SCE, Section 4 of the

25  Franchise requires SCE to pay the City an annual franchise fee.

26       15.    The Franchise is a binding agreement between SCE and the City and is

27  currently in full force and effect.  A true and correct copy of the Franchise is

28  attached as Exhibit 1 hereto.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

7

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

16.    SCE has performed all obligations to be performed on its part under the Franchise, including payment of the franchise fee.  For example, SCE paid the City a franchise fee of $246,446.95 for 2014, and SCE paid the City a franchise fee of $245,695.07 for 2015 (the most recent year for which such information is currently available).

## The CPUC's Exclusive Authority to Supervise
## and Regulate Investor-Owned Public Utilities

17.    The CPUC is a state agency created by the California Constitution and vested with broad authority to supervise and regulate investor-owned public utilities such as SCE.  Cal. Const., art. XII, §§ 1-6.  In addition to the authority the Constitution directly confers on the CPUC, the California Legislature has the "plenary power … to confer additional authority and jurisdiction upon the commission."  *Id.*, art. XII, § 5.  The California Legislature has vested the CPUC with broad authority to "supervise and regulate every public utility in the State" and to "do all things … which are necessary and convenient in the exercise of such power and jurisdiction."  Public Utilities Code § 701.  The Legislature has expressly delegated to the CPUC authority over utility facilities, including standards of construction, maintenance, and operation "to promote and safeguard the health and safety of its employees, …, customers, and the public."  *Id.* § 768.  *See also id.* §§ 761, 762, and 770.  As described by the CPUC: "Both the Commission and the California courts have repeatedly reaffirmed the Commission's *exclusive jurisdiction* over public utility facilities and operations.  Such matters as the location of lines, their electrical and structural adequacy, *their safety*, and their meeting of the needs of the public within this state are clearly, by law, subject to the jurisdiction of this Commission."  CPUC Decision 06-04-055, 2006 WL 1223107, at *3 (Apr. 27, 2006) (italics added; internal quotations and citations omitted).

18.    The CPUC also reviews and approves public utility tariffs, including

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

8

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 31

1    tariff schedules establishing rates for electric service, and tariff rules.  A public

2    utility's tariffs, "like statutes, have the force of law…," and the "Supreme Court has

3    held that a published tariff is to be treated as though it were a statute binding upon

4    both [parties]."  *Transmix Corp. v. Southern Pac. Co.*, 187 Cal.App.2d 257, 267

5    (1960) (citations omitted).  "A utility is under a duty to strictly adhere to its

6    lawfully published tariffs."  CPUC Decision 10-12-022, 2010 WL 5650658 at *6

7    (Dec. 13, 2010) (citation omitted).  Thus, neither the City nor SCE may violate

8    SCE's tariffs.  Tariffs may be updated from time to time, and all changes are

9    approved by the CPUC.

10        19.    Every three years, in a public regulatory proceeding known as the

11   General Rate Case ("GRC"), SCE submits to the CPUC a request for funding for

12   the inspection, maintenance, repair, and replacement of its electrical infrastructure

13   and for additional equipment needed to supply electric service to SCE's customers.

14   The CPUC critically reviews SCE's proposed expenses and expenditures and

15   approves a revenue requirement that the CPUC determines provides "SCE with

16   sufficient funding to provide safe and reliable service at just and reasonable rates."

17   CPUC Decision 09-03-025, *mimeo* at 2, 2009 WL 801553 (Mar. 12, 2009).  *See*

18   *also* Public Utilities Code § 451.  The CPUC also adjusts the rates SCE charges to

19   its customers (the ratepayers) to generate sufficient revenue to meet the approved

20   revenue requirement.  According to the CPUC: "The Commission holds safety,

21   reliability, and just and reasonable rates for customers as the basis of our review."

22   CPUC Decision 12-11-051, *mimeo* at 2, 2012 WL 6641483 (Nov. 29, 2012).  "The

23   Commission's review is primarily driven by a balance of system reliability and

24   ratepayer costs."  *Id.* at 150.

25        20.    Pursuant to California Government Code §§ 37100 and 34000, "[t]he

26   legislative body [of a city] may pass ordinances not in conflict with the Constitution

27   and laws of the State...."  Article XII, § 8 of the California Constitution provides:

28   "A city, county, or other public body may not regulate matters over which the

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

9

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 32

1    Legislature grants regulatory power to the [Public Utilities] Commission."

2                        **The CPUC's Exercise of Jurisdiction over**

3                         **the Undergrounding of Electric Equipment**

4           21.    Historically, the great majority of the electricity public utilities provide

5    to their customers has been, and still is, carried through wires suspended above

6    ground by poles or towers.  The design of underground electric facilities is

7    materially different from the design of above-ground electric facilities.

8    Underground facilities are more expensive to engineer and construct, and it

9    generally takes much longer to do so.  For example, the average cost of

10   construction of a new overhead distribution system is about $100 per foot, and the

11   average cost of construction of a new underground distribution system ranges from

12   about $500 to $1,000 per foot.

13          22.    The CPUC has declared that "[t]he conversion of utilities overhead to

14   underground in this state is inherently a matter of statewide concern, and the

15   regulatory scheme set forth in Section 23 of the California Constitution and

16   Sections 701, 761, 762, and 768 of the Public Utilities Code fully occupies the

17   conversion field."  CPUC Decision 87278, 81 CPUC 593, 1977 WL 42861 at *4

18   (May 3, 1977).  For example, in CPUC Decision 88462, 83 CPUC 418, 1978 WL

19   41896 (Feb. 7, 1978), the CPUC rejected a complaint by the Town of Woodside to

20   compel a public utility to comply with its undergrounding ordinance.  The

21   ordinance permitted replacement or relocation of overhead distribution facilities

22   with different overhead facilities "when the Planning Commission finds that such

23   replacement or relocations will not impede achievement of the Town's objective of

24   having all utilities placed underground or that the replacement or relocation will

25   contribute to the enhancement of the scenic environment of the area."  *Id.* at *3.

26   The CPUC reasoned that the regulation of the utility's "electric distribution

27   facilities is within the exclusive jurisdiction of the Commission."  *Id.* at *6-7.

28          23.    In 1965, the CPUC initiated an investigation into the development of

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

10

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 33

1   uniform rules and regulations concerning the undergrounding of electric and

2   communication facilities. CPUC Decision 73078, 67 Cal.P.U.C. 490 (1967). From

3   that investigation, the CPUC ordered electric public utilities under its jurisdiction to

4   adopt Tariff Rule 20, "Replacement of Overhead with Underground Electric

5   Facilities," a uniform tariff establishing (a) the circumstances under which utilities

6   will replace existing overhead electric facilities with underground electric facilities

7   along public streets and roads and on public lands and private property, and (b) cost

8   responsibility. A true and correct copy of SCE's Rule 20 is attached as Exhibit 2.

9          24.    Rule 20 establishes three types of programs with rules and regulations

10  that govern the conversion of overhead to underground design (set forth in parts A,

11  B, and C thereto). Part A of Rule 20 states that SCE will, at its expense, replace

12  overhead electric facilities with underground facilities if the governing body of a

13  city or county in which the electric facilities are located determines, after consulting

14  with SCE and conducting public hearings, that undergrounding is in the general

15  public interest for one or more of the reasons specified in part A and adopts an

16  ordinance creating an underground district. Pursuant to Part A, SCE's total annual

17  budgeted amount for undergrounding is allocated among cities and counties. As

18  part of the GRC proceedings, the CPUC approves specific amounts of funding for

19  undergrounding pursuant to Rule 20. As of November 9, 2016, the City had $2.1

20  million remaining of its Rule 20.A allocations.

21         25.    In situations not governed by part A of Rule 20, parts B and C require

22  SCE to replace overhead electric facilities with underground electric facilities upon

23  satisfaction of specified requirements. Parts B and C both require the applicant to

24  contribute to the cost of the conversion. Part B requires, among other things, the

25  written agreement by property owners served from the overhead facilities and

26  legislation requiring such changes. Under Part C, when mutually agreed upon by

27  SCE and an applicant, overhead electric facilities may be replaced with

28  underground electric facilities if the applicant pays a non-refundable sum equal to

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

11

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 34

1   the estimated costs of the underground facilities less the estimated net salvage value

2   and depreciation of the replaced overhead facilities.

3         26.    The risk of fire is not one of the reasons set forth in Rule 20.A that a

4   governing body may rely on to require conversion of overhead electric facilities to

5   underground facilities with funds allocated by the CPUC.  In Decision 12-01-032,

6   2012 WL 252537 (Jan. 12, 2012), *rehrg. denied,* CPUC Decision 12-07-025, 2012

7   WL 2945698 (Jul. 12, 2012), *modified,* CPUC Decision 13-06-011, 2013 WL

8   3464300 (Jun. 27, 2013) ("Decision 12-01-032"), the CPUC considered whether

9   "to open a new rulemaking proceeding to consider if electric Tariff Rule 20 should

10  be amended to add 'fire risk' to the list of reasons to permit the undergrounding of

11  aerial facilities pursuant to Tariff Rule 20."  Decision 12-01-032, *mimeo,* at 5.  In

12  electing not to do so, the CPUC stated:

13              The GRC process has several advantages over

14              Tariff Rule 20 in terms of allocating funds for fire-

15              prevention purposes.  First, a GRC enables the utility, the

16              Commission, and interested parties to identify the highest

17              priority fire-prevention projects and to allocate ratepayer

18              funds to those projects.  In contrast, Tariff Rule 20

19              contains no procedures for identifying high priority fire-

20              prevention projects and no mechanism for ensuring that

21              such projects are funded.  Each city and county would

22              have discretion to use its allotted funds for lower priority

23              fire-prevention projects in its own jurisdiction ahead of

24              higher priority projects in other jurisdictions.

25              Second, the only fire-prevention measure available

26              under Tariff Rule 20 is placing overhead power-line

27              facilities underground.  This is perhaps the most

28              expensive fire-prevention tool available.  There are many

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

12

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 35

1   other fire-prevention options, such as line spacers, wire

2   insulation, and vegetation management.  A GRC

3   proceeding would allow the Commission to consider a

4   range of fire prevention options and select the most cost-

5   effective solutions.

6         Finally, fire risk should be assessed from the

7   standpoint of the utility's entire service territory, and not

8   from the piecemeal and narrow geographical perspectives

9   of individual jurisdictions.  The utility can assess wind

10   conditions, vegetation type, population density, and other

11   factors to identify the portions of its service territory

12   where the risk of power-line fires is greatest.  While this

13   can be done in a GRC proceeding, it is not possible with

14   Tariff Rule 20.

15         We conclude for the preceding reasons that there is

16   no need to open a new rulemaking proceeding to consider

17   adding fire risk to the list of reasons to permit

18   undergrounding under Tariff Rule 20.  Our decision to

19   forego a new rulemaking proceeding does not signal any

20   reduction in our concern about fire prevention.  To the

21   contrary, we believe that GRCs are a superior regulatory

22   mechanism for selecting and funding fire-prevention

23   measures compared to the ad hoc allocation of ratepayer

24   funds for fire-prevention projects under Tariff Rule 20.

25   Decision 12-01-032, *mimeo*, at 163-64 (footnote omitted).

26   **The CPUC's Exercise of Exclusive Jurisdiction over**

27   **the Safety of Public Utilities' Electric Facilities**

28   27.   The CPUC has issued detailed general orders binding on public

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

13

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   utilities governing the planning, design, construction, inspection, repair, and

2   maintenance of their electrical equipment.  For example, CPUC General Order 131-

3   D ("GO 131-D") governs the procedures for planning and construction of electric

4   generation, transmission, power, and distribution line facilities and obtaining CPUC

5   approval of such construction, when required.  Section XIV.B of GO 131-D states

6   in part: "This General Order clarifies that local jurisdictions acting pursuant to local

7   authority are preempted from regulating electric power line projects, distribution

8   lines, substations, or electric facilities constructed by public utilities subject to the

9   Commission's jurisdiction."

10       28.    CPUC General Order 95 ("GO 95") contains "requirements for

11  overhead line design, construction, and maintenance, the application of which will

12  ensure adequate service and secure safety to persons engaged in the construction,

13  maintenance, operation or use of overhead lines *and to the public in general*."  GO

14  95, Rule 11 (italics added).  General Order 165 requires that SCE implement an

15  inspection program to assure timely correction of nonconforming conditions.

16       29.    If any person, including a city, believes that a utility's overhead

17  electric facilities are unsafe, it may file a complaint with the CPUC, which must

18  require corrective action if it concludes the facilities are unsafe.  *See* California

19  Public Utilities Code §§ 761, 768; CPUC Rules of Practice and Procedure, 20 Cal.

20  Code of Regulations, Div. 1, Ch. 1, Rule 4.1.

21       30.    The CPUC has affirmatively acted to reduce potential safety hazards

22  associated with overhead utility power lines by adopting measures that it

23  determines are cost effective.  For example, in 2008, the CPUC issued Order

24  Instituting Rulemaking 08-11-005 (the "2008 Rulemaking") to address, among

25  other things, the safety of electric utility facilities.  In that proceeding, the CPUC

26  issued several decisions in which it adopted dozens of new regulations, including

27  new and revised rules that it incorporated in GO 95 to reduce fire and other risks

28  posed by overhead electric facilities.  These decisions include CPUC Decision

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

14

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1   09-08-029, 2009 WL 2910747 (Aug. 20, 2009), *corrected by* D. 09-10-004, 2009

2   WL 3229400 (Oct. 1, 2009), *further corrected by* D. 09-11-002, 2009 WL 3945342

3   (Nov. 6, 2009), *rehrg. denied,* D. 10-02-034, 2010 WL 834439 (Feb. 25, 2010);

4   CPUC Decision 12-01-032, *supra*; CPUC Decision 14-02-015, 2014 WL 555011

5   (Feb. 5, 2014), *modified, and rehrg. denied as modified,* D. 14-12-089, 2014 WL

6   7437438 (Dec. 14, 2015); and CPUC Decision 14-05-020, 2014 WL 2430114 (May

7   15, 2014).

8        31.   In 2015, the CPUC issued Order Instituting Rulemaking 15-05-006

9   (the "2015 Rulemaking") to continue the work it started in the 2008 Rulemaking.

10   The 2015 Rulemaking is currently pending and is intended to accomplish the

11   following:

12            [D]evelop and adopt maps that depict areas of the

13            State where there is an elevated risk of power-line fires

14            igniting and spreading rapidly.  The California

15            Department of Forestry and Fire Protection will have a

16            primary role in the development of these fire-threat maps.

17            The adopted fire-threat maps will be used to:

18            (1) accurately designate the high fire-threat areas where

19            many of the fire-safety regulations adopted in

20            Rulemaking (R.) 08-11-005 apply, and (2) assess the need

21            for additional fire-safety regulations.  New fire-safety

22            regulations will be adopted, as appropriate.  [2015

23            Rulemaking, *mimeo,* at 2 (May 15, 2015).]

24   The CPUC has directed the participants in the proceeding to provide specified

25   information with respect to each proposed new regulation, including, among other

26   things, how it reduces or otherwise addresses fire hazards in High Fire-Threat

27   Districts (to be identified in connection with the proceeding), the estimated costs,

28   and whether and how the costs will be recovered from the utilities' customers.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

15

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1  CPUC Decision 17-01-009, 2017 WL 371635 at *29-30 (Jan. 19, 2017).  The

2  CPUC "remind[ed] all parties that the proponent of a proposed regulation has the

3  burden of demonstrating that the regulation is reasonable and should be adopted by

4  the Commission."  *Id.*, at *30.

5      32.   In August 2016, Governor Edmund G. Brown, Jr. vetoed a bill (SB

6  1463) that would have required the CPUC, in consultation with the California

7  Department of Forestry and Fire Protection ("CalFire"), to prioritize areas in which

8  communities are subject to conditions that increase fire hazards associated with

9  overhead utility facilities when determining areas in which it will require enhanced

10  wildfire mitigation measures.  In his September 24, 2016 veto message to the

11  Legislature, the Governor explained:

12              Since May of last year, the Commission and

13              CalFire have been doing just that through the existing

14              proceeding on fire-threat maps and fire-safety regulations.

15              This deliberative process should continue and the issues

16              this bill seeks to address should be raised in that forum.

17      33.   The City has been an active participant in the 2015 Rulemaking.  For

18  example, in June 2016, the City filed with the CPUC a prehearing conference

19  statement in which it proposed that "fire safety regulations should include a

20  mandate that local governments with jurisdiction over high fire-threat areas may

21  require undergrounding of overhead utility lines and equipment if, for example, the

22  local government bears a percentage of the cost of construction of undergrounding

23  facilities, less any authorized credits and exclusive of return and tax components."

24  Most recently, on February 10, 2017, in connection with the parties' consideration

25  of a variety of possible fire-safety measures, the City proposed an amendment to

26  GO 95 that would require utilities and communication infrastructure providers "to

27  develop a Plan for identifying and correcting Safety Hazards in its service territory"

28  and to "include as potential corrective action the hardening or undergrounding of

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

16

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 39

1    the electric system or related utility infrastructure that is along or adjacent to such

2    access roads." This proposal is not limited to fire threats. The term "Safety

3    Hazard" "means a condition that poses a significant threat to human life or

4    property." GO 95, Rule 18.

5                              **SCE's Electric Facilities in the City**

6          34.    SCE's electric facilities in the City consist of underground and

7    overhead systems extending over approximately 88 miles. The majority of SCE's

8    electric facilities are overhead, consisting primarily of poles, overhead wires, and

9    related above-ground equipment with voltage levels of 66 kilovolts and lower.

10         35.    Pursuant to the CPUC's General Orders, and as needed for safety

11   reasons, SCE replaces deteriorated or damaged utility poles and other equipment

12   and poles that are overloaded based on the weight of facilities located on the poles

13   or the lines attached to the poles. SCE has inspection programs to identify poles

14   and related facilities in need of replacement. For many years, SCE has had in place

15   a Deteriorated Pole Replacement Program to identify and replace deteriorated

16   poles. In its published decisions in the 2012 and 2015 GRCs, the CPUC included

17   in SCE's approved revenue requirement funding for the replacement of poles

18   pursuant to this program. Pole replacements are assigned a priority based on the

19   condition of the pole, ranging from replacement within 72 hours after inspection

20   (Priority 1) to within three years after inspection (Priority 2C). In 2016, SCE

21   replaced approximately 31 poles in the City under this program. In 2017, SCE

22   plans to continue replacing poles in the City under the program and estimates it will

23   be replacing 29 poles. Apart from this program, SCE replaces poles and other

24   equipment immediately or within a short time if a problem is identified requiring

25   prompt action, such as when a vehicle hits a pole, there is a lightning strike, or a

26   pole-mounted transformer fails.

27         36.    In January 2014, SCE and the City entered into a Memorandum of

28   Agreement (the "MOA") regarding SCE's inspection and utility pole replacement

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

17

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 40

1  programs.  In the MOA, the parties acknowledged and agreed, among other things,
2  that (a) "[i]n accordance with provisions of state law and a franchise agreement
3  with the City, SCE has constructed, owns, uses and operates, and is responsible for
4  the maintenance of poles, wires, conduits and appurtenances within the City's
5  jurisdiction for the purpose of transmitting and distributing electricity to the
6  public," (b) SCE has and will continue to make in-kind pole replacements for safety
7  reasons, including on emergency and non-emergency bases (paras. 2, 6), and (c) the
8  CPUC "establishes design requirements for SCE's facilities, including
9  poles[,] . . . with which SCE must comply . . ." (para. 3).  The MOA includes
10  detailed provisions for SCE to provide notice to the City of pole replacements
11  (para. 6).  The MOA provides that it will "remain in full force and effect until and
12  unless terminated by mutual written agreement of the parties" (para. 8).  No mutual,
13  written termination of the MOA has occurred as of the filing of this Complaint, and
14  the MOA is in full force and effect.  SCE has complied with its obligations under
15  the MOA.  A true and correct copy of the MOA is attached as Exhibit 3 hereto.

16          **The City's Adoption of the Undergrounding Ordinance**

17          37.    In October 2016, the City sent to SCE a draft of the Undergrounding
18  Ordinance.  In correspondence and in a meeting, SCE provided detailed objections
19  to the proposed Undergrounding Ordinance explaining why it violated the
20  Franchise and state law.  SCE also proposed reasonable alternatives to
21  undergrounding.

22          38.    Notwithstanding SCE's objections and proposals, on March 28, 2017,
23  the City adopted the Undergrounding Ordinance, effective April 27, 2017.  A true
24  and correct copy of the Undergrounding Ordinance is attached as Exhibit 4.

25          39.    The preamble to the Undergrounding Ordinance describes fires, road
26  closures, and power outages caused by overhead electric facilities and vehicle
27  collisions with utility poles and recites that the City Council has determined that the
28  public necessity, health, safety, and welfare require the underground installation of

18

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 41

1  new, replacement, and relocated poles, overhead wires and associated overhead

2  structures used for supplying electric, communication, or similar or associated

3  services within the City.

4      40.    The Undergrounding Ordinance adds several sections to the City's

5  Municipal Code.  Section 21.25.020 provides that, with the exception of certain

6  equipment appurtenant to underground facilities and cable television lines, "[a]ll

7  new public and private utility wires and associated structures shall be installed and

8  maintained underground…."  Section 21.25.030 requires undergrounding of any

9  permanent replacement, relocation or reconstruction of poles, overhead wires, and

10  associated overhead structures initiated by a utility.  The Undergrounding

11  Ordinance does not make a distinction based on whether particular poles, overhead

12  wires, or associated overhead structures present any of the risks the City identified

13  in describing its reasons for adopting the Undergrounding Ordinance.

14      41.    The Undergrounding Ordinance contains two exceptions to the

15  foregoing requirements.  Municipal Code Section 21.25.040 requires a utility to

16  give six months' prior notice to the City of any proposal to install, replace, relocate,

17  or reconstruct any existing poles, overhead wires, and associated overhead

18  structures.  The notice shall include a request for an exception.  First, as set forth in

19  Municipal Code Sections 21.25.040 and 21.25.070(a), the city engineer "may"

20  grant a request for an exception for (a) the installation, permanent replacement,

21  relocation, or reconstruction of *not more than three* contiguous poles that are not

22  part of any Major Remodel, as defined in the City's Municipal Code, or (b) certain

23  "nominal" modifications (excluding poles) that "will not likely create or exacerbate

24  an existing fire, traffic or other public safety hazard."  Second, under Sections

25  21.25.040, 21.25.060, and 21.25.070(b), following a duly noticed public hearing,

26  the City Council of the City "may" approve an exception in cases of "unusual

27  circumstances."  Unusual circumstances may be found if application of the

28  undergrounding requirements would "(i) result in negative impacts on the

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

19

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 42

1  environment, property or utility operations that outweigh the public necessity,
2  health, safety or welfare, (ii) be infeasible or (iii) be inconsistent with city policy or
3  regulations."  An exception may not be granted for a Major Remodel or for
4  construction of a new building for which utilities must be installed underground.
5  For the decades during which SCE has operated under the Franchise, it has never
6  been required to submit to such delays or discretionary approvals in order to
7  construct, repair, or replace its electric facilities.

8  **The Effect of the Undergrounding Ordinance on SCE and the Public, and**
9  **its Interference with the Jurisdiction of the CPUC**

10  42.  Currently, the circumstances under which SCE may replace overhead
11  with underground electric facilities are governed by Rule 20.  Rule 20 does not
12  contain an exception for mandates by municipalities such as the City.  The
13  Undergrounding Ordinance is inconsistent with Rule 20.  The City has not
14  complied with any of the steps required under Rule 20.  The Undergrounding
15  Ordinance does not provide for the City's compliance with Rule 20 or for the City
16  to pay for undergrounding, and the City has not agreed to pay all, or any part of,
17  such costs.

18  43.  The Undergrounding Ordinance seeks to provide the City and its
19  residents with preferential treatment compared to all other customers in SCE's
20  service territory.  The City seeks to require the undergrounding of SCE's electric
21  facilities within the City's borders and to shift nearly all of the costs to SCE
22  customers outside of the City who would not benefit from such changes.  Based on
23  meter count, *less than one-quarter of one percent* of SCE's customers are located
24  in the City.

25  44.  The Undergrounding Ordinance materially interferes with SCE's
26  ability to comply with Public Utilities Code § 453(a), which states: "No public
27  utility shall as to rates, charges, service, facilities, or in any other respect, make or
28  grant any preference or advantage," and with § 453(c), which states: "No public

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

20

1   utility shall establish or maintain any unreasonable difference as to rates, charges,

2   service, facilities, or in any other respect, either as between localities or as between

3   classes of service."  The Undergrounding Ordinance purports to do exactly this, in

4   contravention of this nondiscrimination law.

5       45.    The undergrounding of electric facilities concerns the design and

6   construction of the electrical system, a matter within the exclusive authority of the

7   CPUC.  If the City were permitted, by ordinance, to dictate how SCE can design

8   and construct its electric facilities, other municipalities would view this as an open

9   invitation to do the same, construction costs would skyrocket at the expense of the

10  utilities' customers who ultimately bear the cost, and the CPUC's authority to

11  assure safe and reliable service at "reasonable rates" would be undermined.

12      46.    The Undergrounding Ordinance directly interferes with the CPUC's

13  authority in the pending 2015 Rulemaking and in other contexts to determine

14  whether SCE's electric system is safe and, if it determines additional safety

15  measures are required, to determine what the most appropriate and cost-effective

16  measures are, and how and when they should be implemented.  For example, the

17  Undergrounding Ordinance interferes with the CPUC's ability to prioritize

18  expenditures so that the geographical areas that present the greatest risk are

19  addressed first.  The Undergrounding Ordinance also purports to deny the CPUC

20  the authority it has under GO 131-D to approve and authorize construction of new

21  overhead systems in Laguna Beach.

22      47.    In the GRCs for SCE, the CPUC has approved funds for deteriorated

23  pole replacement, along with infrastructure improvement and maintenance

24  activities, that were projected based on the existing SCE systems and do not

25  account for the new requirements the City is attempting to enforce, without CPUC

26  approval, through the Undergrounding Ordinance.  The CPUC has also approved

27  specified funding for undergrounding pursuant to Rule 20.  The Undergrounding

28  Ordinance interferes with the CPUC's authority by bypassing the CPUC approval

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

21

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 44

1   process.

2         48.    In addition, the Undergrounding Ordinance materially interferes with

3   SCE's ability to maintain and repair its electric system in the City in compliance

4   with CPUC General Orders and tariffs.  The uncertain criteria included in the

5   Undergrounding Ordinance infringe upon areas of regulation squarely within the

6   purview of the CPUC, namely the design, maintenance, repair, and safety of SCE's

7   overhead electric facilities.  Compliance with the Undergrounding Ordinance would

8   require that SCE suspend its programs for replacing deteriorated poles and other

9   equipment when necessary and turn to the much more time-consuming, labor-

10   intensive, and more expensive process of undergrounding its facilities.  It is highly

11   probable that the City's exemption scheme will delay certain maintenance and

12   replacement of poles, transformers, and other equipment to the point of creating

13   safety hazards and detrimentally impacting system reliability.  Any attempt to take

14   advantage of one of the exceptions would require a lengthy delay with an uncertain

15   outcome.

16         49.    Enforcement of the Undergrounding Ordinance against SCE would

17   cause SCE and its customers to suffer irreparable harm.  For example, enforcement

18   would likely lead to service interruptions and safety hazards if SCE were prevented

19   from conducting timely maintenance, repairs, and in-kind replacements of its

20   overhead electric facilities.  SCE's costs of installing and maintaining its electric

21   facilities in the City would substantially increase.  Such cost increases would likely

22   require SCE (a) to use funds it would otherwise use for needed capital

23   improvements to its electric system, (b) to seek increases in the rates it charges its

24   customers (the overwhelming majority of whom do not live in the City), or both.  In

25   addition, SCE would be placed in an untenable position of violating state law

26   because it cannot both comply with the Undergrounding Ordinance and with state

27   law, as established by Tariff 20, Public Utilities Code § 453, and decisions and

28   orders of the CPUC.

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

22

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 45

# **FIRST CLAIM FOR RELIEF**

(For Injunctive Relief for Unconstitutional

Impairment of the Franchise Pursuant to the

Contract Clause of the United States Constitution)

50.     SCE incorporates by reference the allegations in paragraphs 1 through 49, inclusive, of this Complaint.

51.     This claim is brought under Article I, § 10, clause 1 of the United States Constitution which, among other things, prohibits any state from passing any "law impairing the obligation of contracts...."  This claim is also brought pursuant to 42 U.S.C. § 1983.

52.     The Franchise created a contractual relationship between the City and SCE that gives SCE contractual and property rights in the nature of an easement in exchange for valuable consideration.

53.     The application of the Undergrounding Ordinance to the regular business activities of SCE within the City constitutes a substantial and unconstitutional impairment of the Franchise, in violation of Article I, § 10, clause 1, because it (a) deprives SCE of its right conferred by the Franchise to construct, erect, install, operate, and use poles and other facilities along, across and upon the City's streets despite the fact that SCE has paid for such rights and continues to do so, (b) interferes with SCE's right conferred by the Franchise to maintain, use, repair, or replace its poles, wires and other equipment, and (c) substantially increases SCE's costs of constructing and maintaining its electric facilities within the City.

54.     The Undergrounding Ordinance is not an exercise of the City's police powers that can limit SCE's rights under the Franchise because the Undergrounding Ordinance (a) would effectively eliminate material terms of the Franchise, and (b) is in conflict with the paramount authority of the State, specifically the authority of the CPUC (Public Utilities Code § 6294).

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

55.     The impairment of SCE's rights under the Franchise is neither reasonable nor necessary for an important public purpose.  The circumstances that the City relies upon to justify the Undergrounding Ordinance existed at the time the City granted the Franchise, and the City has adequate means of achieving its goals that would not involve an impairment of SCE's Franchise by the City, including through Rule 20 or by requesting special relief from the CPUC.

56.     SCE seeks preliminary and permanent injunctions enjoining the City from enforcing the Undergrounding Ordinance against SCE.  As alleged above, the City's enforcement of the Undergrounding Ordinance against SCE will cause SCE and its customers to suffer irreparable harm for which SCE has no adequate remedy at law.

57.     SCE has incurred and will continue to incur attorneys' fees because of the City's unlawful actions in amounts that cannot yet be ascertained.  SCE is entitled to recover its attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## SECOND CLAIM FOR RELIEF

(For Injunctive Relief for Unconstitutional

Impairment of the Franchise Pursuant to the

Contract Clause of the California Constitution)

58.     SCE incorporates by reference the allegations in paragraphs 1 through 49 and 52, inclusive, of this Complaint.

59.     Article I, § 9 of the California Constitution, among other things, provides that a "law impairing the obligation of contracts may not be passed."

60.     The application of the Undergrounding Ordinance to the regular business activities of SCE within the City constitutes a substantial and unconstitutional impairment of the Franchise, in violation of Article I, § 9 of the California Constitution, because it (a) deprives SCE of its right conferred by the Franchise to construct, erect, install, operate, and use poles and other facilities along, across and upon the City's streets despite the fact that SCE has paid for such

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

EXHIBIT A
PAGE 47

1   rights and continues to do so, (b) interferes with SCE's right conferred by the

2   Franchise to maintain, use, repair, or replace its poles, wires and other equipment,

3   and (c) substantially increases SCE's costs of constructing and maintaining its

4   electric facilities within the City.

5       61.    The Undergrounding Ordinance is not an exercise of the City's police

6   powers that can limit SCE's rights under the Franchise because the Undergrounding

7   Ordinance (a) would effectively eliminate material terms of the Franchise, and

8   (b) is in conflict with the paramount authority of the State, specifically the authority

9   of the CPUC (Public Utilities Code § 6294).

10      62.    The impairment of SCE's rights under the Franchise is neither

11  reasonable nor necessary for an important public purpose.  The circumstances that

12  the City relies upon to justify the Undergrounding Ordinance existed at the time the

13  City granted the Franchise, and the City has adequate means of achieving its goals

14  that would not involve an impairment of SCE's Franchise by the City, including

15  through Rule 20 or by requesting special relief from the CPUC.

16      63.    SCE seeks preliminary and permanent injunctions enjoining the City

17  from enforcing the Undergrounding Ordinance against SCE.  As alleged above, the

18  City's enforcement of the Undergrounding Ordinance against SCE will cause SCE

19  and its customers to suffer irreparable harm for which SCE has no adequate remedy

20  at law.

21              **THIRD CLAIM FOR RELIEF**

22          (For Injunctive Relief Based on Preemption of the

23          Undergrounding Ordinance by California State Law

24              and for Violations of California State Law)

25      64.    SCE incorporates by reference the allegations in paragraphs 1 through

26  49, inclusive, of this Complaint.

27      65.    As set forth in detail above, the undergrounding of public utilities'

28  electrical equipment is an issue of statewide importance demanding uniform

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

25

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1    treatment.  The CPUC has exclusive jurisdiction over undergrounding, including

2    when public utilities should be required to place their electric facilities underground

3    and who should bear the cost, and the CPUC has exercised its exclusive

4    jurisdiction.  SCE's compliance with the Undergrounding Ordinance would violate

5    Rule 20 and would interfere with SCE's ability to comply with the CPUC's

6    decisions and General Orders, including with respect to maintenance and repair of

7    its electric facilities in the City.  In addition, the Undergrounding Ordinance

8    interferes with the CPUC's authority over the design of SCE's electric facilities, the

9    allocation of funding for SCE's infrastructure and operations, and its ability to

10   regulate safety issues in a cost-effective manner, including through the pending

11   2015 Rulemaking.  Accordingly, the Undergrounding Ordinance is preempted as a

12   matter of law by the regulatory authority granted to the CPUC by the California

13   Legislature and the California Constitution.

14        66.    Since the City first notified SCE of the proposed Undergrounding

15   Ordinance in October 2016, SCE has been urging the City to refrain from enacting

16   the ordinance for the reasons set forth in this Complaint.  SCE has communicated

17   its objections to the Undergrounding Ordinance in person and in writing.  The City

18   has refused to comply with SCE's requests and has instead adopted, and intends to

19   enforce, the Undergrounding Ordinance.

20        67.    SCE seeks preliminary and permanent injunctions enjoining the City

21   from enforcing the Undergrounding Ordinance against SCE.  As alleged above, the

22   City's enforcement of the Undergrounding Ordinance against SCE will cause SCE

23   and its customers to suffer irreparable harm for which SCE has no adequate remedy

24   at law.  Thus, it is necessary and appropriate for the Court to hold that the

25   Undergrounding Ordinance is preempted as a matter of law and to issue preliminary

26   and permanent injunctions preventing the City from enforcing it against SCE.

27        68.    SCE has incurred and will continue to incur attorneys' fees because of

28   the City's unlawful actions in amounts that cannot yet be ascertained.  SCE is

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

1    entitled to recover its attorneys' fees pursuant to California Code of Civil Procedure

2    § 1021.5.

3    **FOURTH CLAIM FOR RELIEF**

4    (For Declaratory Relief to Determine that

5    the Undergrounding Ordinance is Invalid and Unenforceable)

6    69.    SCE incorporates by reference the allegations in paragraphs 1 through

7    49, 51 through 55, 59 through 62, 65, and 66, inclusive, of this Complaint.

70.    An actual controversy has now arisen and exists between the parties

requiring a declaration by the Court of their respective rights and duties.  SCE

contends that the Undergrounding Ordinance is invalid and unenforceable because

it violates the Contract Clauses of the United States and California Constitutions

and is preempted by, and violates, state law.  The City, however, disputes this

position and has proceeded with enacting the Undergrounding Ordinance, insisting

it is valid and enforceable in its entirety.

71.    Such a declaration is necessary and appropriate because in the absence

of a declaration invalidating the Undergrounding Ordinance, SCE will be forced to

forego rights to which it is entitled under the Franchise and must choose whether to

violate the Undergrounding Ordinance or to violate state law (including Rule 20

and Public Utilities Code § 453(a) and (c)); it cannot comply with both

simultaneously.

72.    Pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil

Procedure, SCE seeks a judicial determination that, based on the Contract Clauses

of the United States and California Constitutions and preemption by state law, the

Undergrounding Ordinance is invalid and unenforceable against SCE.

73.    SCE has incurred and will continue to incur attorneys' fees because of

the City's unlawful actions in amounts that cannot yet be ascertained.  SCE is

entitled to recover its attorneys' fees pursuant to 42 U.S.C. § 1988(b) and California

Code of Civil Procedure § 1021.5.


CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

27

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## **PRAYER FOR RELIEF**

Wherefore, SCE prays for judgment against the City as follows:

A.      For a preliminary injunction restraining City from enforcing the Undergrounding Ordinance against SCE during the pendency of this action;

B.      For a permanent injunction restraining City from enforcing the Undergrounding Ordinance against SCE;

C.      That the Court declare that the Undergrounding Ordinance is invalid and unenforceable against SCE because it violates the Contract Clauses of the United States and California Constitutions and is preempted by California state law;

D.      For costs of suit SCE incurs in this action;

E.      For reasonable attorneys' fees according to proof; and

F.      For such other and further relief as the Court may deem just and proper.

Dated:      April 5, 2017                    Carlsmith Ball LLP


                                             By: /s/ James Polish
                                                 James Polish
                                                 Mary R. Conklin
                                                 Attorneys for Plaintiff
                                                 Southern California Edison Company

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1

## **DEMAND FOR JURY TRIAL**

2      In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, SCE

3  hereby demands a trial by jury on any and all issues triable by a jury.

4

5  Dated:     April 5, 2017                    Carlsmith Ball LLP

6

7                                             By: /s/ James Polish
                                                  James Polish
8                                                 Mary R. Conklin
                                                  Attorneys for Plaintiff
9                                                 Southern California Edison Company

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CARLSMITH BALL LLP
ATTORNEYS AT LAW
LOS ANGELES

4821-9701-0502.2

29

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**EXHIBIT A
PAGE 52**

# EXHIBIT 1

# EXHIBIT 1

ORDINANCE NO. 289

ORDINANCE GRANTING TO SOUTHERN CALIFORNIA EDISON
COMPANY, ITS SUCCESSORS AND ASSIGNS, A FRANCHISE
TO CONSTRUCT AND USE, FOR TRANSMITTING AND DIS-
TRIBUTING ELECTRICITY TO THE PUBLIC FOR ANY AND
ALL PURPOSES, POLES, WIRES, CONDUITS AND APPUR-
TENANCES, INCLUDING COMMUNICATION CIRCUITS,
NECESSARY OR PROPER THEREFOR IN, ALONG, ACROSS,
UPON AND UNDER THE PUBLIC STREETS, WAYS, ALLEYS
AND PLACES WITHIN THE CITY OF LAGUNA BEACH.

The City Council of the City of Laguna Beach does ordain as
follows:

Section 1.  Whenever in this ordinance the words or phrases
hereinafter in this section defined are used, they shall have the
respective meanings assigned to them in the following definitions
(unless, in the given instance, the context wherein they are used
shall clearly import a different meaning):

(a)  The word "grantee" shall mean the corporation to which
the franchise contemplated in this ordinance is granted and
its lawful successors or assigns;

(b)  The word "City" shall mean the City of Laguna Beach, a
municipal corporation of the State of California, in its
present incorporated form or in any later reorganized, con-
solidated, enlarged or re-incorporated form;

(c)  The word "streets" shall mean the public streets, ways,
alleys and places as the same now or may hereafter exist
within said City;

(d)  The phrase "poles, wires, conduits and appurtenances"
shall mean poles, towers, supports, wires, conductors,
cables, guys, stubs, platforms, crossarms, braces, trans-
formers, insulators, conduits, ducts, vaults, manholes,
meters, cut-outs, switches, communication circuits, ap-
pliances, attachments, appurtenances and any other property
located or to be located in, upon, along, across, under

or over the streets of the City, and use or useful
in the transmitting and/or distributing of electricity;
(e)  The phrase "construct and use" shall mean to
lay, construct, erect, install, operate, maintain, use,
repair or replace.

Section 2.  The franchise to construct and use for
transmitting and distributing electricity to the public
for any and all purposes, poles, wires, conduits and appur-
tenances, including communication circuits necessary or
proper therefor in, along, across, upon and under the
public streets, ways, alleys and places within the City of
Laguna Beach, is hereby granted to Southern California Edison
Company, upon the terms and conditions set forth in the
Franchise Act of 1937.

Section 3.  Said franchise shall be indeterminate,
that is to say, said franchise shall endure in full force
and effect until the same shall, with the consent of the
Public Utilities Commission of the State of California,
be voluntarily surrendered or abandoned by the grantee,
or until the State or some municipal or public corpora-
tion thereunto duly authorized by law shall purchase by
voluntary agreement or shall condemn and take under the
power of eminent domain, all property actually used and
useful in the exercise of said franchise and situate in
the territorial limits of the State, municipal or public
corporation purchasing or condemning such property, or
until said franchise shall be forfeited for noncompliance
with its terms by the grantee.

-2-

Section 4.  The grantee of said franchise shall, during the term thereof, pay to said City, a sum annually which shall be equivalent to two (2%) percent of the gross annual receipts of said grantee arising from the use, operation or possession of said franchise; provided, however, that such payment shall in no event be less than a sum which shall be equivalent to one (1%) percent of the gross annual receipts derived by grantee from the sale of electricity within the limits of such City under said franchise.

Section 5.  The grantee hereof shall file with the Clerk of said City, within three (3) months after the expiration of the calendar year, or fractional calendar year, following the date of the granting of this franchise, and within three (3) months after the expiration of each and every calendar year thereafter, a duly verified statement showing in detail the total gross receipts of said grantee, during the preceding calendar year, or such fractional calendar year, from the sale of electricity within said City.  Such grantee shall pay to said City within fifteen (15) days after the time for filing said statement, in lawful money of the United States, the aforesaid percentage of its gross receipts for the calendar year, or such fractional calendar year, covered by said statement.  Any neglect, omission or refusal of said grantee to file said verified statement, or to pay said percentage at the time or in the manner hereinbefore provided, shall be grounds for the declaration of a forfeiture of this franchise and of all rights of grantee hereunder.

Section 6.  The grantee of this franchise shall file a bond, running to the City of Laguna Beach, with at least two good and sufficient sureties, to be approved by the legislative body thereof, in the penal sum of One Thousand ($1,000.00) Dollars, conditioned that the grantee shall well and truly observe, fulfill and perform each and every term and condition of this

-5-

franchise, and that in case of any breach of condition of said

bond, the whole amount of the penal sum therein named shall be

taken and deemed to be liquidated damages and shall be recoverable

from the principal and sureties upon said bond.  Said bond shall

be filed with the legislative body of the City of Laguna Beach

within five (5) days after the date of the granting of this

franchise; and in case said bond shall not be so filed, or shall

not receive the approval of the legislative body, this franchise

shall be forfeited and any money paid to the City in connection

therewith shall likewise be forfeited.

Section 7.  This franchise is granted under and in accordance

with provisions of said Franchise Act of 1937.

Section 8.  This ordinance shall become effective thirty (30)

days after its final passage, unless suspended by referendum

petition filed as provided by law.

Section 9.  The grantee of this franchise shall pay to the

City a sum of money sufficient to reimburse it for all publica-

tion expenses incurred by it in connection with the granting

thereof; said payment to be made within thirty (30) days after the

City shall have furnished said grantee with a written statement

of such expenses.

Section 10.  The franchise granted hereby shall not become

effective until written acceptance thereof shall have been filed

by the grantee with the City Clerk.

Section 11.  The City Clerk shall cause this ordinance to be

published once within fifteen (15) days after its passage in

The South Coast News, a newspaper of general circulation published

and circulated in said City.

First read at a regular meeting of the City Council of said

City held on the 7th day of April, 1948, and finally adopted and

-4-

ordered published at an adjourned regular meeting of said

Council held on the 14th day of April, 1948 by the following

vote:

|  |  |  |
|---|---|---|
| AYES: | Councilmen | Rawson, Hall, |
|  |  | Beach, Reed, and Kimble. |
|  |  |  |
| NOES: | Councilmen | None. |
| ABSENT: | Councilmen | None. |


                                        C. G. KIMBLE
                              Mayor of the City of Laguna Beach


ATTEST:


        ED. H. BEAVER
   City Clerk of the City of
       Laguna Beach

(SEAL)

-5-

# EXHIBIT 2

# EXHIBIT 2



| Southern California Edison | | Revised | Cal. PUC Sheet No. | 31867-E |
| Rosemead, California  (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 23018-E |

Rule 20                                                     Sheet 1
REPLACEMENT OF OVERHEAD WITH UNDERGROUND ELECTRIC FACILITIES

A.   SCE will, at its expense, replace its existing overhead electric facilities with underground electric facilities along public streets and roads, and on public lands and private property across which rights-of-way satisfactory to SCE have been obtained by SCE, provided that:

   1.   The governing body of the city or county in which such electric facilities are and will be located has:

      a.   Determined, after consultation with SCE and after holding public hearings on the subject, that such undergrounding is in the general public interest for one or more of the following reasons:

         (1)   Such undergrounding will avoid or eliminate an unusually heavy concentration of overhead electric facilities;

         (2)   The street or road or right-of-way is extensively used by the general public and carries a heavy volume of pedestrian or vehicular traffic;   (T)

         (3)   The street or road or right-of-way adjoins or passes through a civic area or public recreation area or an area of unusual scenic interest to the general public; or   (T)

         (4)   The street or road or right-of-way is considered an arterial street or major collector road, as defined in the Governor's Office of Planning and Research General Plan Guidelines.   (N)
                                                                                                      |
                                                                                                      (N)

      b.   Adopted an ordinance creating an underground district in the area in which both the existing and new facilities are and will be located requiring, among other things, (1) that all existing overhead communication and electric distribution facilities in such district shall be removed, (2) that each property served from such electric overhead facilities shall have installed in accordance with SCE's rules for underground service, all electrical facility changes on the premises necessary to receive service from the underground facilities of SCE as soon as it is available, and (3) authorizing SCE to discontinue its overhead service.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
| Advice   1643-E | John R. Fielder | Date Filed   Jul 26, 2002 |
| Decision   01-12-009 | Senior Vice President | Effective   Sep 4, 2002 |
|  |  | Resolution   E-3767 |

1C16



| | | Revised | Cal. PUC Sheet No. | 23019-E |
|---|---|---|---|---|
Southern California Edison
Rosemead, California     (U 338-E)

Cancelling   Revised   Cal. PUC Sheet No.   12201-E

Rule 20                              Sheet 2
REPLACEMENT OF OVERHEAD WITH UNDERGROUND ELECTRIC FACILITIES

(Continued)

A.    (Continued)

2.    SCE's total annual budgeted amount for undergrounding within any city or the unincorporated area of any county shall be allocated as follows:

a.    The amount allocated to each city and county in 1990 shall be the highest of:

1.    The amount allocated to the city or county in 1989, which amount shall be allocated in the same ratio that the number of overhead meters in such city or unincorporated area of any county bears to the total system overhead meters; or

2.    The amount the city or county would receive if SCE's total annual budgeted amount for undergrounding provided in 1989 were allocated in the same ratio that the number of overhead meters in each city or the unincorporated area of each county bears to the total system overhead meters based on the latest count of overhead meters available prior to establishing the 1990 allocations; or

3.    The amount the city or county would receive if SCE's total annual budgeted amount for undergrounding provided in 1989 were allocated as follows:

a.    Fifty percent of the budgeted amount allocated in the same ratio that the number of overhead meters in any city or the unincorporated area of any county bears to the total system overhead meters; and

b.    Fifty percent of the budgeted amount allocated in the same ratio that the total number of meters in any city or the unincorporated area of any county bears to the total system meters.

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice   1268-E-B | John R. Fielder | Date Filed   May 11, 1998 |
| Decision   97-10-087 | Senior Vice President | Effective   Jan 4, 1998 |
| 2C4 | | Resolution |



| Southern California Edison | | Revised | Cal. PUC Sheet No. | 23020-E |
|---|---|---|---|---|
| Rosemead, California   (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 12202-E |

Rule 20                                    Sheet 3
REPLACEMENT OF OVERHEAD WITH UNDERGROUND ELECTRIC FACILITIES

(Continued)

A. (Continued)

2.   (Continued)

b.   Except as provided in Section 2.c., the amount allocated for undergrounding within any city or the unincorporated area of any county in 1991 and later years shall use the amount actually allocated to the city or county in 1990 as the base, and any changes from the 1990 level in SCE's total annual budgeted amount for undergrounding shall be allocated to individual cities and counties as follows:

1.   Fifty percent of the change from the 1990 total budgeted amount shall be allocated in the same ratio that the number of overhead meters in any city or unincorporated area of any county bears to the total system overhead meters.

2.   Fifty percent of the change from the 1990 total budgeted amount shall be allocated in the same ratio that the total number of meters in any city of the unincorporated area of any county bears to the total system meters.

c.   When a city incorporates, resulting in a transfer of utility meters from the unincorporated area of a county to the city, there shall be a permanent transfer of a prorata portion of the county's 1990 allocation base referred to in Section 2.b. to the city.  The amount transferred shall be determined:

1.   Fifty percent based on the ratio that the number of overhead meters in the city bears to the total system overhead meters; and

2.   Fifty percent based on the ratio that the total number of meters in the city bears to the total system meters.

When territory is annexed to an existing city, it shall be the responsibility of the city and county affected, in consultation with SCE serving the territory, to agree upon an amount of the 1990 allocation base that will be transferred from the county to the city, and thereafter to jointly notify SCE in writing.

(Continued)

(To be inserted by utility)                    Issued by                    (To be inserted by Cal. PUC)
Advice    1268-E-B                         John R. Fielder              Date Filed    May 11, 1998
Decision    97-10-087                    Senior Vice President         Effective    Jan 4, 1998
3C4                                                                      Resolution

EXHIBIT 2, PAGE 39
**EXHIBIT A**
**PAGE 62**



| Southern California Edison | | Revised | Cal. PUC Sheet No. | 31868-E |
|---|---|---|---|---|
| Rosemead, California   (U 338-E) | Cancelling | Revised | Cal. PUC Sheet No. | 23021-E |

<u>Rule 20</u>                                                           Sheet 4
<u>REPLACEMENT OF OVERHEAD WITH UNDERGROUND ELECTRIC FACILITIES</u>

(Continued)

A. (Continued)

    2.    (Continued)

        d.    However, Section 2.a, b, and c, shall not apply to any utility where the total amount available for allocation under Rule 20-A is equal to or greater than 1.5 times the previous year's statewide average on a per customer basis.  In such cases, SCE's total annual budgeted amount for undergrounding within any city or the unincorporated area of any county shall be allocated in the same ratio that the number of overhead meters in the city or unincorporated area of any county bears to the total system overhead meters.

        e.    Upon request by a city or county, the amounts allocated may be exceeded for each city or county by an amount up to a maximum of five years' allocation at then-current levels where SCE establishes that participation on a project is warranted and resources are available.  Such allocated amount may be carried over for a reasonable period of time in communities with active undergrounding programs.  In order to qualify as a community with an active undergrounding program, the governing body must have adopted an ordinance or ordinances creating an underground district and/or districts as set forth in Section A.1.b. of this Rule.  Where there is a carry-over or additional requested participation as discussed above, SCE has the right to set, as determined by its capability, reasonable limits on the rate of performance of the work to be financed by the funds carried over.  When amounts are not expended or carried over for the community to which they are initially allocated, they shall be assigned when additional participation on a project is warranted or be reallocated to communities with active undergrounding programs.   (C) | (C) | (C) (C)

(Continued)

| (To be inserted by utility) | Issued by | (To be inserted by Cal. PUC) |
|---|---|---|
| Advice   1643-E | John R. Fielder | Date Filed   Jul 26, 2002 |
| Decision   01-12-009 | Senior Vice President | Effective   Sep 4, 2002 |
| 4C17 | | Resolution   E-3767 |



Southern California Edison        Revised    Cal. PUC Sheet No.   26177-E
Rosemead, California    (U 338-E)     Cancelling   Revised    Cal. PUC Sheet No.   23022-E

---

Rule 20                  Sheet 5
REPLACEMENT OF OVERHEAD WITH UNDERGROUND ELECTRIC FACILITIES

(Continued)

A.    (Continued)

     3.      The undergrounding extends for a minimum distance of one block or 600 feet, whichever is the lesser.

         Upon request of the governing body, SCE will pay from the existing allocation of that entity for:

         a.      The installation of no more than 100 feet of each customer's underground electric service lateral occasioned by the undergrounding, and/or

         b.      The conversion of a customer's meter panel to accept underground service occasioned by the undergrounding, excluding permit fees.

     SCE or the governing body may establish a lesser allowance, or may otherwise limit the amount of money to be expended on a single customer's electric service, or the total amount to be expended on all electric service installations in a particular project.

B.    In circumstances other than those covered by A above, SCE will replace its existing overhead electric facilities with underground electric facilities along public streets and roads or other locations mutually agreed upon when requested by an applicant or applicants when all of the following conditions are met:

     1.    a.      All property owners served from the overhead facilities to be removed first agree in writing to have the wiring changes made on their premises so that service may be furnished from the underground distribution system in accordance with SCE's rules and that SCE may discontinue its overhead service upon completion of the underground facilities, or

         b.      Suitable legislation is in effect requiring such necessary wiring changes to be made and authorizing SCE to discontinue its overhead service.

(Continued)

---

(To be inserted by utility)         Issued by         (To be inserted by Cal. PUC)
Advice    1399-E          John R. Fielder        Date Filed   Aug 23, 1999
Decision _____   Senior Vice President    Effective    Oct 2, 1999
5C5                                          Resolution _____

EXHIBIT 2, PAGE 41
**EXHIBIT A
PAGE 64**



Southern California Edison
Rosemead, California        (U 338-E)

Revised     Cal. PUC Sheet No.   31869-E*
Cancelling  Revised     Cal. PUC Sheet No.   31093-E

Rule 20                                  Sheet 6
REPLACEMENT OF OVERHEAD WITH UNDERGROUND ELECTRIC FACILITIES

(Continued)

B.    (Continued)

2.    The applicant has:

a.    Furnished and installed the pads and vaults for transformers and associated
equipment, conduits, ducts, boxes, pole bases and performed other work
related to structures and substructures including breaking of pavement,
trenching, backfilling, and repaving required in connection with the installation
of the underground system, all in accordance with SCE's specifications, or, in
lieu thereof, paid SCE to do so;

b.    Transferred ownership of such facilities, in good condition, to SCE; and

c.    Paid a nonrefundable sum equal to the excess, if any, of the estimated costs,
including transformers, meters, and services, of completing the underground
system and building a new equivalent overhead system.   The cost of removal
of the overhead poles, lines, and facilities are the responsibility of SCE and will
be paid by SCE.   Such payments shall not operate to reduce Rule 20.A
allocations.

3.    The area to be undergrounded includes both sides of a street for at least one block or
600 feet, whichever is the lesser, and all existing overhead communication and electric
distribution facilities within the area will be removed.

4.    SCE may, when requested and authorized by the city or county and mutually agreed      (N)
upon by such government entity and SCE, initially fund any required               |
engineering/design costs for conversion projects under this section.  In the event such    |
a project proceeds, the requesting city or county shall reimburse SCE for such       |
engineering/design costs before SCE shall be required to commence further work on     |
the project.  In the event the project is not approved to proceed within two and one-    |
half years of SCE's delivery of such engineering/design study, the requesting city or    |
county shall reimburse SCE for its costs of such engineering/design study within 90    |
days of a demand by SCE.  In the event a city or county does not reimburse SCE      |
within 90 days of its demand for reimbursement, SCE shall be permitted to expense     |
such costs as an operational cost and shall reduce the city or county's allocations    (N)
provided under Section A of this Schedule by the like amount.

C.    In circumstances other than those covered by A or B above, when mutually agreed upon by
SCE and an applicant, overhead electric facilities may be replaced with underground electric
facilities, provided the applicant requesting the change pays, in advance, a non-refundable sum
equal to the estimated cost of the underground facilities less the estimated net salvage value
and depreciation of the replaced overhead facilities.  Underground services will be installed and
maintained as provided in SCE's rules applicable thereto.

D.    The term "underground electric system" means an electric system with all wires installed
underground, except those wires in surface mounted equipment enclosures.

(To be inserted by utility)              Issued by              (To be inserted by Cal. PUC)
Advice     1643-E                      John R. Fielder           Date Filed    Jul 26, 2002
Decision   01-12-009                 Senior Vice President       Effective     Sep 4, 2002
6C18                                                            Resolution    E-3767

EXHIBIT 2, PAGE 42
**EXHIBIT A**
**PAGE 65**

# EXHIBIT 3

# EXHIBIT 3

## MEMORANDUM OF AGREEMENT BETWEEN
## CITY OF LAGUNA BEACH AND SOUTHERN CALIFORNIA EDISON
## REGARDING UTILITY POLE REPLACEMENT PROGRAM

This Memorandum of Agreement ("MOA") is hereby made and entered into by and between the City of Laguna Beach ("City"), a California municipal corporation, and Southern California Edison ("SCE"), an Edison International Company and a public utility company under the laws of the State of California.

1.  In accordance with provisions of state law and a franchise agreement with the City, SCE has constructed, owns, uses and operates, and is responsible for the maintenance of poles, wires, conduits and appurtenances within the City's jurisdiction for the purpose of transmitting and distributing electricity to the public.

2.  SCE makes the decision to replace a utility pole due to its age (e.g., poles that are 50 years or older are generally prioritized for replacement), pole loading (the weight of the facilities present on the pole/line), and pole deterioration (e.g., wood rot, insect damage, etc.). SCE has had, currently has, and expects to continuously have, a need to inspect and replace old and potentially deteriorated and/or overloaded utility poles in the City. SCE plans to replace approximately 80 poles by the end of the 2013 calendar year. SCE anticipates that it will inspect and replace similar numbers of poles over the next several years. The sole purpose of these inspections and replacements is safety. Utility poles are not being replaced to facilitate or accommodate the installation of new wireless/cellular antennae.

3.  The California Public Utilities Commission ("CPUC") establishes design requirements for SCE's facilities, including poles. These requirements, with which SCE must comply, are set forth in CPUC General Order 95 ("GO 95"). GO 95 may ultimately mandate an increase in height of a pole designated for replacement to accommodate appropriate vertical clearances between different components of SCE's own system (e.g., clearance between electrical conductors), clearances SCE and already existing third party systems (e.g., clearance between electrical conductors and cable or telephone lines), and ensuring a safe clearance between SCE's lines and the ground (e.g., ensuring appropriate pole tension and preventing line sag).

4.  The City has expressed concerns and questions regarding SCE's proposal to replace utility poles at an increased height. The City has also expressed concerns and questions regarding the potential effect of SCE's pole replacement program on the City's desire and efforts to underground existing overhead utility facilities.

5.  CPUC General Order 131-D ("GO 131-D") declares that the construction of electric distribution (under 50 kV) line facilities does not require discretionary permits or approvals by the City. However, GO 131-D further provides that to ensure safety and compliance with local building standards, SCE must first communicate with, and obtain the input of, the City regarding land use matters and obtain any non-discretionary local permits required for the construction and operation of such projects.

#14-04

6.      SCE's proposed replacement of utility poles constitutes "development" for purposes of the California Coastal Act, for which the City is designated as the permitting authority in the first instance for the issuance of a coastal development permit ("CDP"). The City acknowledges that SCE's proposed replacement of utility poles qualifies for an exclusion from the requirement to obtain a CDP from the City, provided that such replacement complies with the following terms and conditions:

a.      The exclusion from the requirement to obtain a CDP from the City applies only to those utility poles that are proposed to be replaced for the purpose of addressing conditions of age, deterioration and/or overloading, and where the proposed replacement conforms to applicable CPUC safety and design requirements. Pole replacements will be at the minimal height necessary to achieve compliance with such requirements.

b.      The exclusion from the requirement to obtain a CDP from the City shall not apply to those utility poles that are proposed to be replaced for the purpose of facilitating or accommodating the installation of new wireless/cellular facilities or to be replaced with new or added equipment (e.g., cross-arms, wires, guy wires, etc.).

c.      SCE shall, on an annual basis, provide the City with a list of utility poles identified for replacement on a non-emergency basis within the following 12 months. The parties acknowledge that changes (additions or deletions) to the annual list are anticipated throughout the year as scopes of work continue to be developed, and SCE shall provide reasonable advance notice to the City on an ongoing basis as such changes are made. To the extent feasible and practicable, SCE shall provide the City with advance notice of the proposed replacement of a utility pole on an emergency basis. In the event advance notice cannot be provided, SCE shall provide notice to the City as soon as reasonable possible after the replacement has occurred.

d.      SCE shall post advance notice of proposed utility pole replacement on each pole proposed to be replaced on a non-emergency basis for at least two weeks prior to the date such replacement commences.

e.      SCE shall make provision for a post-installation review of a utility pole replacement, on a complaint-driven basis from a neighboring property owner, to evaluate and, if appropriate, implement reasonable modifications that can be made to the replacement pole, or the pole's location, to reduce adverse visual impacts while ensuring compliance with applicable CPUC safety and design requirements.

f.      SCE will, upon written request from the City, provide and/or prepare inventory maps subject to a confidentiality and non-disclosure agreement as may be required, to the maximum extent permitted by law, to protect information deemed sensitive to SCE or that may otherwise be withheld from public disclosure pursuant to applicable law. The City agrees to timely notify SCE of any public requests to inspect and/or copy the information so that SCE may take any steps it deems necessary or warranted to protect against or restrict disclosure. The City further acknowledges that the information on the inventory maps may not reflect actual field conditions, and any reliance by the City on such information in the preparation and/or approval of any permits or plans shall be at the City's own risk as to such conditions.

-2-

        g.    SCE's pole replacement program will not preclude, delay or make more expensive the future undergrounding of overhead utilities.

        8.    This MOA shall remain in force and effect until and unless terminated by mutual written agreement of the parties.

        9.    The persons executing this MOA represent that they are authorized to do so on behalf of their respective organizations and, in so doing, are binding their respective organizations to the terms and conditions of this MOA.

        IN WITNESS WHEREOF, the City and SCE have executed this MOA as set forth below.

Dated: _1 – 16 – 14_

CITY OF LAGUNA BEACH

By: _____

John Pietig, City Manager

ATTEST: _____

Lisette Chel-Walker, City Clerk

Dated: _1 – 10 – 2014_

SOUTHERN CALIFORNIA EDISON

By: _Frank Wasko_

Frank Wasko, SCE Regional Manager

-3-

# EXHIBIT 4

# EXHIBIT 4

Attachment 1

ORDINANCE NO. _____

**AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF LAGUNA BEACH
ADDING CHAPTER 21.25 TO THE LAGUNA BEACH MUNICIPAL CODE
REQUIRING THE UNDERGROUNDING OF NEW AND REPLACEMENT POLES,
OVERHEAD WIRES AND ASSOCIATED OVERHEAD STRUCTURES AND
AMENDING SECTIONS 21.24.010, 21.24.020 AND 21.24.080 RELATING TO
UNDERGROUNDING OF UTILITIES**

**WHEREAS**, the City Council has determined the public necessity, health, safety and welfare requires the underground installation of new, replacement, and relocated poles, overhead wires and associated overhead structures used for supplying electric, communication, or similar or associated services within the City.

**WHEREAS**, in recent years, poles, overhead wires and associated overhead structures have caused numerous and significant fire-related disasters, road closures, power outages due to downed utility lines in the City, which is located within a high fire hazard severity zone designated by the California Department of Forestry and Fire Protection, including at least five significant fires in the City between 2007 and 2015 caused by electrical sources, and 58 vehicle collisions with utility poles located on Laguna Canyon Road since 2007.

**WHEREAS**, the danger that wildfires pose to the public is widely recognized throughout the state, and in a recent case concerning insurance legislation and rulemaking that followed the widespread devastation and underinsurance crisis arising from the 2003 and 2007 San Diego wildfires, the California Supreme Court acknowledged that "[w]ildfires are "a fact of life in California, and so, too, are the threats they pose to people and property." *Ass'n of Cal. Insurance Companies v. Jones* (Jan. 23, 2017 Case No. S226529) __Cal.5th__ [p. 1].

**WHEREAS**, the City's existing Wireless Communications Facilities ordinance, codified in Chapter 25.55 of the Laguna Beach Municipal Code, establishes guidelines for the permitting, placement, design and maintenance of wireless communications facilities within the City with the stated purposes of prescribing clear, reasonable and predictable criteria to assess and process applications in a consistent and expeditious manner, while reducing impacts associated with wireless communications facilities, protecting the health, safety and welfare of persons living and working in the City, preserving the aesthetic values and scenic qualities of the City, and allowing for the orderly and efficient deployment of wireless communications facilities in accordance with state and federal laws.

**WHEREAS**, the City's existing Underground Utility Districts ordinance, codified in Chapter 21.24 of the Laguna Beach Municipal Code, implements a program established under California Public Utilities Commission Rule 20, and authorizes the city council to declare a designated area an underground utility district and order the removal and underground installation of poles, overhead wires and associated overhead structures used or useful in supplying electric, communication or similar or associated service by means of electrical materials or devices if,

3

Attachment 1

after conducting a public hearing, the council finds that the public necessity, health, safety or welfare requires such removal and such underground installation within such designated area.

**WHEREAS**, the City Council has determined that separate and apart from the programs established by the existing Underground Utilities Districts ordinance and Wireless Telecommunications Facilities ordinance, the health, convenience, and safety of the general public, including safety for public travel, require the underground installation of new, replacement, and relocated poles, overhead wires and associated overhead structures initiated by, or required of, any utility supplying electric, or similar or associated service within the City.

**WHEREAS**, under its existing franchise agreements with public utilities, the City retains its powers of control to supervise and regulate the relationship between each contracting public utility and the general public in matters affecting the health, convenience, and safely of the general public, including matters such as the use and repair of public streets by any public utility, and more specifically, the location of the poles, wires, mains, or conduits of any public utility, on, under, or above any public streets, pursuant to Public Utilities Code Section 2902.

**WHEREAS**, at its meeting on March 22, 2016, the City Council directed, among other actions, that an ordinance be prepared, regulating the location of utility facilities on, under, above or along public streets, by requiring the undergrounding of any new, replaced, or relocated utility facilities and infrastructure.

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF LAGUNA BEACH DOES ORDAIN AS FOLLOWS:**

**SECTION 1.**  Chapter 21.25 is hereby added to the Laguna Beach Municipal Code to read in its entirety as follows:

CHAPTER 21.25   UNDERGROUNDING OF UTILITIES

| | |
|---|---|
| 21.25.010 | Definitions. |
| 21.25.020 | Undergrounding of New Public Utility Facilities |
| 21.25.030 | Undergrounding of Permanent Replacement, Relocated or Reconstructed Facilities |
| 21.25.040 | Installation, Replacement, Relocation or Reconstruction of an Overhead System—Notice to City |
| 21.25.050 | Public Hearing |
| 21.25.060 | Notice to property owners and utility companies |
| 21.25.070 | Exceptions or Unusual Circumstances |

21.25.010      Definitions.

For purposes of this chapter, all terms shall have the same meaning as defined in Chapter 21.24, except the following term, which shall have the meaning described below:

(1) "Poles, overhead wires and associated overhead structures" means poles, towers, supports, wires, conductors, guys, stubs, platforms, cross-arms, braces, transformers, insulators, cutouts,

4

Attachment 1

switches, appliances, attachments and appurtenances located aboveground and used or useful in supplying electric, communication and cable television, or similar or associated service, except for and not including antennas, associated equipment and supporting structures used by a provider exclusively for furnishing wireless communication services;

21.25.020    Undergrounding of New Public Utility Facilities.

All new public and private  poles, overhead wires and associated overhead structures shall be installed and maintained underground, except that surface-mounted transformers, pedestal-mounted terminal boxes, meter cabinets, concealed ducts in an underground system and other equipment appurtenant to underground facilities located on private property or installed pursuant to any agreement need not be installed underground, and provided further that cable television lines may be installed on existing utility poles within subdivisions developed with overhead utility lines.

21.25.030    Undergrounding of Permanent Replacement, Relocated or Reconstructed Facilities.

A permanent replacement, relocation or reconstruction of poles, overhead wires and associated overhead structures initiated by a utility or by an entity other than the City must be located and maintained underground, if following notice and the public hearing required by Section 21.25.050, the city council determines that the public necessity, health, safety or welfare requires underground installation of such facilities.  For purposes of this section, reconstruction means any substantial repair of or any improvement to existing poles, overhead wires and associated overhead structures

21.25.040    Installation, Replacement, Relocation or Reconstruction of an Overhead System—Notice to City.

At any time a utility proposes to install, replace, relocate or reconstruct any existing poles, overhead wires, and associated overhead structures, the utility shall provide six months' prior notice to the City.  The notice shall include any request for exception made pursuant to Section 21.25.070. The city council shall conduct a public hearing in accordance with Section 21.25.050.

21.25.050    Public Hearing.

Upon receipt by the City of any notice received pursuant to Section 21.25.040 or other information regarding the replacement, relocation, reconstruction or new construction of wires and facilities to supply electric, cable television, or similar or associated services, the city council shall call a public hearing to determine whether the public necessity, health, safety or welfare requires the underground installation of such utilities.  The city clerk shall notify all affected property owners within the approximate boundary of the project as shown on the last equalized assessment roll and utilities concerned by mail of the time and place of such public hearing at least ten days prior to the date thereof.  Each such hearing shall be open to the public and may be continued from time to time. At each such hearing all persons interested shall be given an opportunity to be heard.  At the conclusion of the hearing, the city council shall make a determination as to whether the public necessity, health, safety or welfare requires the

5

Attachment 1

underground installation of the facilities.  The decision of the city council shall be made by resolution and is final and conclusive.

21.25.060        Notice to property owners and utility companies.

Within ten days after the effective date of a resolution adopted pursuant to Section 21.25.050, the city clerk shall notify all affected utilities and all affected persons owning real property within the approximate boundary of the project. . The city clerk shall further notify such affected property owners of the necessity that, if they or any person occupying such property desire to continue to receive electric, cable television, or similar or associated service, they or such occupant shall provide all necessary facility changes on their premises so as to receive such service from the lines of the supplying utility or utilities at a new location as soon as it is available, subject to the applicable rules, regulations and tariffs of the respective utility or utilities on file with the Commission.

Notification by the city clerk shall be made by mailing a copy of the resolution adopted pursuant to Section 21.25.050, together with a copy of this chapter, to affected property owners within the approximate boundary of the project as such are shown on the last equalized assessment roll and to the affected utilities.

21.25.070        Exceptions or Unusual Circumstances.

(a)   Upon request by any person or utility, the city engineer may grant an exception to the requirements of Section 21.25.020 and Section 21.25.030, for (i) the installation, permanent replacement, relocation or reconstruction of not more than three (3) contiguous poles; provided, however, that no such exception shall be granted for any utility service connections proposed to be installed as part of any Major Remodel, as that term is defined in Section 25.08.024, or the construction of any new building for which utilities are required to be installed underground pursuant to Section 25.53.010 and Section 25.35.120, or (ii) the installation, permanent replacement, relocation or reconstruction of overhead wires and associated overhead equipment, exclusive of poles and any other ground based structures, which may constitute a nominal modification to such overhead equipment; provided, however that such exception shall require a determination by the city engineer that the system modification for which the exception is requested will not likely create or exacerbate an existing fire, traffic or other public safety hazard.

(b)   Upon request by any person or utility, the city council may approve an exception to the requirements of Section 21.25.020 and Section 21.25.030 in cases of unusual circumstances, subject to appropriate terms and conditions and without discrimination as to any person or utility. For purposes of this section, unusual circumstances may be found if the city council determines that applying the requirements of Section 21.25.020 or 21.25.030 would: (i) result in negative impacts on the environment, property or utility operations that outweigh the public necessity, health, safety or welfare that would be derived from the undergrounding, (ii) be infeasible or (iii) be inconsistent with city policy or regulations; provided, however, that no such exception shall be granted for any utility service connections proposed to be installed as part of any Major Remodel, as that term is defined in Section 25.08.024, or the construction of any new building

6

Attachment 1

for which utilities are required to be installed underground pursuant to Section 25.53.010 and Section 25.35.120.

(c)  A request made under subsection (b) shall include a proposed approximate boundary of the area proposed for an exception to Sections 21.25.020 and 24.25.030 (to be verified as an appropriate boundary by the City) and be submitted to the city manager for recommendation and shall be acted upon by the city council following a public hearing.  The city clerk shall notify all utilities concerned and affected property owners as shown on the last equalized assessment roll within a minimum of 300 feet of the approximate boundary of the area proposed for an exception as determined by the City by mail of the time and place of such public hearing at least ten (10) days prior to the date thereof.  Each such hearing shall be open to the public and may be continued from time to time.  At each such hearing all persons interested shall be given an opportunity to be heard.

(d) Prior to seeking judicial relief with respect to a dispute regarding the requirements of Section 21.25.020 and Section 21.25.030, any aggrieved person or utility must exhaust available administrative remedies by making a request for an exception pursuant to subsection (b) above. Any resulting decision of the city council may be challenged in a court of competent jurisdiction in accordance with the time limits set forth in Chapter 1.06.

**SECTION 2.**  Sections 21.24.010, 21.24.020, and 21.24.080 of the Laguna Beach Municipal Code are hereby amended to read in their entirety as follows:

21.24.010      Definitions.

Whenever in this chapter the words or phrases hereinafter in this section defined are used, they shall have the respective meanings assigned to them in the following definitions:

(1)      "Commission" means the Public Utilities Commission of the State of California;

(2)      "Underground utility district" or "district" means that area in the city within which poles, overhead wires, and associated overhead structures are prohibited as such area is described in a resolution adopted pursuant to the provisions of Section 21.24.040;

(3)      "Person" means and includes individuals, firms, corporations, partnerships, and their agents and employees;

(4)      "Poles, overhead wires and associated overhead structures" means poles, towers, supports, wires, conductors, guys, stubs, platforms, cross-arms, braces, transformers, insulators, cutouts, switches, communication circuits, appliances, attachments and appurtenances located aboveground within a district and used or useful in supplying electric, communication, and cable television or similar or associated service;

(5)      "Utility" includes all persons or entities supplying electric, communication and cable television, or similar or associated service by means of electrical materials or devices.

21.24.020 Public hearing by city council.

7

Attachment 1

The city council may from time to time call public hearings to ascertain whether the public necessity, health, safety or welfare requires the removal of poles, overhead wires and associated overhead structures within designated areas of the city and the underground installation of wires and facilities for supply electric, communication, cable television, or similar or associated service. The city clerk shall notify all affected property owners as shown on the last equalized assessment roll and utilities concerned by mail of the time and place of such hearings at least ten days prior to the date thereof. Each such hearing shall be open to the public and may be continued from time to time. At each such hearing all persons interested shall be given an opportunity to be heard. At the conclusion of the hearing, the city council shall make a determination as to whether the public necessity, health, safety or welfare requires the underground installation of the facilities.  The decision of the city council shall be final and conclusive.

21.24.080        Notice to property owners and utility companies.

Within ten days after the effective date of a resolution adopted pursuant to Section 21.24.040, the city clerk shall notify all affected utilities and all persons owning real property within the district created by said resolution of the adoption thereof. The city clerk shall further notify such affected property owners of the necessity that, if they or any person occupying such property desire to continue to receive electric, communication, cable television, or similar or associated service, they or such occupant shall provide all necessary facility changes on their premises so as to receive such service from the lines of the supplying utility or utilities at a new location as soon as it is available, subject to the applicable rules, regulations and tariffs of the respective utility or utilities on file with the Commission.

Notification by the city clerk shall be made by mailing a copy of the resolution adopted pursuant to Section 21.24.040, together with a copy of this chapter, to affected property owners as such are shown on the last equalized assessment roll and to the affected utilities.

**SECTION 3.**  This ordinance is categorically exempt from the California Environmental Quality Act.

**SECTION 4.**  This ordinance shall take effect thirty (30) days after the date of its adoption.

**SECTION 5.** The City Clerk of the City of Laguna Beach shall certify to the passage and adoption of this Ordinance and shall cause the same to be published in the manner required by law in the City of Laguna Beach.

**PASSED, APPROVED** and **ADOPTED** this 28th day of March 2017.

_____
**Toni Iseman, Mayor**

8

Attachment 1

**ATTEST:**

_____
**Lisette Chel-Walker, City Clerk**

       I, Lisette Chel-Walker, City Clerk of the City of Laguna Beach, do hereby certify that the foregoing Ordinance was introduced at a regular meeting of the City Council on February 28, 2017, and was finally adopted at a regular meeting of the City Council of said City held on March 28, 2017 by the following vote:

               AYES:       COUNCILMEMBER(S):

               NOES:       COUNCILMEMBER(S):

          ABSENT:       COUNCILMEMBER(S):


_____
         City Clerk of the City of Laguna Beach, CA

9